IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| HIDEAWAY HOLDINGS and LAWRENCE JAMES SACCATO, TRUSTEE, | ) ) ) ) | |
| Plaintiffs, | ) ) | TC-MD 091292C |
| v. | ) ) ) | |
| DOUGLAS COUNTY ASSESSOR, | ) ) | |
| Defendant. | ) | **DECISION** |

This appeal involves the real market value (RMV) of a ministorage building Defendant added to the assessment and tax rolls (the rolls) as omitted property. The building is identified in the assessor's records as part of Account R37121 (subject property). On April 2, 2009, Defendant added the building at issue to the rolls as omitted property for tax years 2005-06 through 2008-09, inclusive. Defendant filed a written Answer to Amended Complaint on May 27, 2011.

By order issued April 11, 2011, this court granted Defendant's Supplemental Motion for Summary Judgment. That Order basically concluded that Defendant acted properly in adding the building at issue, referred to by the parties and this court previously as the ninth ministorage building, to the rolls as omitted property for the years at issue (2005-06 through 2008-09). The case then went forward on the question of the value of that building. Pursuant to the agreement of the parties, affirmed by the court in a Journal Entry issued May 24, 2011, the valuation evidence focused only on the January 1, 2005, assessment date for the 2005-06 tax year.

A trial on the valuation issue was held by telephone on August 8, 2011. Valynn Currie (Currie), Plaintiffs' representative, appeared on behalf of Plaintiffs. Also appearing and

testifying for Plaintiffs were Steve Gerlt (Gerlt), Plaintiffs' other authorized representative, Lawrence Saccato (Saccato), owner of subject property, and Rick Poland (Poland), a local ministorage owner. Paul Meyer, Douglas County Counsel, represented Defendant. Brian Lif (Lif), Registered Appraiser 3, appeared and testified on behalf of Defendant.

Plaintiffs' Exhibits PE-1 though PE-8, and Defendant's Exhibits A, B, and C were admitted without objection. Optional closing statements were submitted by the parties and the record closed on September 16, 2011.

## I. STATEMENT OF FACTS

The subject property is a complex of ministorage buildings known as Hideaway Storage, located on 2.77 acres that slopes uphill from the front of the property to the back. (Def's Ex C at 7.) The complex is located "in the Green District approximately 6.5 miles south of Roseburg [Oregon]." (*Id*.) As indicated above, the dispute centers on the RMV of one particular building that the parties refer to as the "ninth" mini warehouse building (ninth building). (*Id*. at 4.) In 2008, Plaintiffs filed a petition with the county board of property tax appeals (BOPTA) concerning the 2008-09 tax year. During the course of that "appeal," Defendant became aware of the ninth building per a 2004 aerial photograph.[1] (*Id*. at 6.) The property was added to the rolls in April 2009. Defendant's 2009 omitted property assessment valued the ninth building at $58,500 for the 2005-06 tax year. (*Id*.) According to Defendant's appraisal report, before the assessment of the omitted ninth building,

/ / /

/ / /

/ / /

---

[1] The omitted property assessment increased the RMV, maximum assessed value (MAV), and assessed value (AV) for tax years 2006-07, 2007-08, and 2008-09, as well.

"* * * the complex consisted of 19,800 square feet of buildings and carried an RMV on the improvements of $445,500. The building RMV of $445,500 divided by 19,800 square feet is $22.50 per square foot. That same value per square foot was simply applied to the 2,600 sq. ft. of the omit building when it was added to the tax roll for 2005."

(*Id*.)

Plaintiffs request the court to decrease the RMV of the ninth building to $24,000. (Ptfs' Ex PE-1.) Defendant requests that the court sustain the $58,500 RMV on the tax rolls.

The subject property consists of terraced ministorage buildings, and the ninth building is located at the rear of the property, highest on the hill. (Def's Ex C at 6.) Saccato testified the ninth building is a metal shell with metal frame building that has roll up metal doors. The building has no insulation, no electricity, and no plumbing. The total area of the ninth building is 2,600 square feet and it sits atop a concrete slab of the same size. (*Id*. at 4.) Saccato testified the concrete slab was built prior to the construction of the ninth building.

Both Plaintiffs and Defendant agree there is an oversupply of ministorage buildings in the market area where the subject property is located. That oversupply has led to a decrease in unit rental rates and occupancy rates. (*Id*.) Poland testified that rental rates have decreased to approximately 40 percent of what they were five to six years ago due to the oversupply of ministorage units. Poland also testified that occupancy rates have decreased. He had a waiting list for storage units in 2003 and now he has an occupancy rate of 50 percent. Defendant acknowledged the effects on the subject property's value during a 2009-10 tax year BOPTA appeal: "[d]ue to an oversupplied market of mini warehouse properties and its impact for 2009, the valuation of the subject property was reduced." (*Id*.)

Saccato testified regarding some additional problems with the ninth building. The building is located at the end of a steep gravel road, farthest from the storage unit entrance. On

occasion, vehicles heavily loaded with items for storage had difficulty navigating the steep drive to the ninth building. Saccato also testified that he had occasionally decreased the rental price of units in the ninth building to $65 per month because of the steep road.

In determining the 2005-06 real market value of the ninth building, Plaintiffs' agent, Gerlt, testified that he relied on the cost approach and the income approach. Gerlt testified that the income approach is less relevant because the occupancy levels for the ninth building have not stabilized and the occupancy data is therefore less accurate. Defendant's Registered Appraiser, Lif, relied on the cost approach, market approach, and income approach, with primary emphasis on the market approach. (*Id*. at 10.)

A. *Market Approach*

Plaintiffs did not conduct a market approach. Lif determined the price per square foot by considering 10 ministorage building comparables in Douglas County. (*Id*. at 26.) The sales were recorded on: March 26, 2002; March 26, 2002; May 27, 2003; July 30, 2003; April 19, 2005; June 2, 2005; July 31, 2007; August 24, 2007; April 24, 2008; and September 26, 2008. (*Id*.) Lif testified that he started with the total complex price, and then subtracted out the land value and miscellaneous adjustments to determine a building residual. He calculated a cost per square foot by dividing the building residual by the total square feet. Lif determined a mean price per square foot of $23 for sales from 2002-2005 and a mean price per square foot of $35 for sales from 2005-2008. (*Id*.) He put the most weight on the "Riddle Self Storage" sales comparable. Lif concluded a total value of $22.50 per square foot, or $58,500, under the market approach. (*Id*. at 10.)

On cross examination, Lif admitted that, unlike Hideaway Holdings, Riddle Self Storage is not on a hillside, and is partly paved and surrounded by razor wire. Additionally, Lif testified

that he did not time adjust the sale comparables to 2005, or adjust for lack of yard improvements. Gerlt questioned the accuracy of the land values, specifically noting the difference between the land value of $150,000 used for Winston Mini Storage, and the stated land value of $167,714 on the Winston Mini Storage Commercial Sales Verification sheet.  (*Id*. at 26, 27.)

B.      *Cost Approach*

Plaintiffs relied on a "Proposal" from 2000 by Mako Structures, Inc., to establish cost. (Ptfs' Ex PE-5.)  The Proposal states that "*We Propose* hereby to furnish material –complete in accordance: with specification below, for the sum of: * * * ($13,877)[.]"  (*Id*.) (Emphasis in original.)  Labor was also "completed by Mako Structures" at a cost of $4,888.  (*Id*.)

Defendant's representative brought out on cross-examination, and Saccato acknowledged, that the proposal did not include the cost to install a concrete slab because the ninth building was built on a pre-existing slab.  Saccato estimated that a 2,600 square foot slab cost roughly $1.80 per square foot, or $4,680, to build.  Lif disagreed and testified that a typical concrete slab cost between $3 and $5 per square foot, or $7,800 to $13,000 for the slab on the subject property.  Additionally, Saccato was uncertain whether the total bid price included the cost of permits, but estimated the permits would have cost $350 to $400.  Gerlt added the cost of building materials, labor, and the concrete slab, to determine a real market value of $23,445 for the ninth building, which comes to $9 per square foot.

Lif valued the building under the cost approach using Marshall & Swift Valuation Service.  (Def's Ex. C at 8.)  He categorized the ninth building as a "metal component class S rank 1 building" and concluded that "[v]aluation via Marshall and Swift for the January 1, 2005 base data indicates a valuation of $19.44/sq. ft. or $50,500 for the subject[] 'ninth' mini warehouse building."  (*Id*.)   Gerlt noted on cross-examination that Lif did not include the current

cost modifier or local cost modifier in his appraisal report. Furthermore, Lif admitted that he was not certain that the software program used to run his calculations was accurate.

Plaintiffs' witness Poland questioned Defendant's $19.44 per square foot value. Poland, a ministorage owner in the area, testified that he owns two ministorage facilities purchased in 2000 and 2005. He testified that he built additional ministorage buildings on his properties that included insulation, electrical wiring, heating, and cameras, at a cost of $19 per square foot. Poland testified that his ministorage units are nicer than the subject property because they include the insulation, electrical wiring, heating, and cameras, whereas Plaintiffs' ninth building is "just a metal shell." Without those additions, Poland concluded the price per square foot would have been less than his cost of $19 per square foot, and less than Defendant's $19.44 per square foot value estimate.

C.    *Income Approach*

Gerlt relied on data provided by Saccato, as well as a 2009 BOPTA recommendation regarding the subject property, to determine the value of the ninth building. Gerlt forecasted the likely gross income by taking the number of units in the ninth building (13) and multiplying that number by a unit rental rate of $70 per month, which he then multiplied by 12 to get an annual potential gross income (PGI) of $10,920. (Ptfs' Ex PE-8.) Gerlt testified that he used an occupancy rate of 30 percent, because typically only three to five units were occupied at a given time. Gerlt also testified that he used the same expense ratio, 40 percent, and the same overall capitalization rate of 9 percent (8 percent capitalization rate, plus a 1 percent effective tax rate), as was used on the 2009 BOPTA recommendation. (Ptfs' Ex PE-7.) Applying the 30 percent occupancy rate and the 40 percent expense ratio resulted in an estimated net operating income

(NOI) of $1,956.[2] (Ptfs' Ex PE-8.) Gerlt capitalized the NOI at 9 percent to determine an RMV of $21,840 ($21,833) for the ninth building. (*Id*.) To adjust for the difference in the market from 2005 to 2009, Gerlt recommended using an overall capitalization rate of 8 percent, for a real market value of $24,450 ($24,562.50).

Lif testified on cross-examination that he did not know if the rental rate or occupancy numbers used by Gerlt were accurate, as he had not verified them.

Lif testified that he relied on Plaintiffs' 2003 through 2006 profit and loss statements, and sales comparables, to calculate the RMV of the ninth building. Lif averaged the net sales from Plaintiffs' 2003-2006 profit and loss statements and determine a PGI of $67,333. (*See* Ptfs' Ex PE-6-6C.) He calculated the expense ratio by taking the mean expense ratio, 35 percent, from seven sales of comparable mini warehouses. Those seven comparables are located around Oregon and Washington, and were sold between January 2004, and February 2005. (Def's Ex C at 46.) Subtracting the forecasted PGI from the estimated gross expenses, Lif determined an NOI of $43,767. Lif relied on 16 sale comparables sold from January 25, 2005, to May 31, 2010, to determine a capitalization rate of 7.5 percent. (*Id*. at 47, 48.)

Lif testified that he computed an "effective tax rate" by taking the nominal tax rate, $10.0362 per thousand, multiplying it by the 2005 changed property ratio, .77, to arrive at an effective property tax rate of 0.77 percent. (*Id*. at 49.) Lif added the capitalization rate and the effective property tax rate, for an overall capitalization rate of 8.3 percent. He capitalized the NOI of $43,767 at 8.3 percent to determine a real market value of $527,310. Lif then did a land extraction, subtracting the 2005 land valuation of $103,875, for a building residual of $423,435. Lif divided the $423,435 building residual by the total square feet of the subject property (all

---

[2] The court notes a slight mathematical error in Gerlt's NOI; the NOI should be $1,966, not $1,956. That only slightly alters the indicated capitalized value(s).

nine buildings), which is 22,400 square feet, and arrived at an indicated value per square foot of $18.90, or $49,140 for the 2,600 square foot building at issue. (Def's Closing Argument at 5.)

Lif reconciled the cost, income and market approaches he used by taking the approximate average, $20 per square foot, and multiplying it by the square feet in the ninth building, 2,600, for an overall real market value of $52,000 for the ninth building. (*Id.*)

## II. ANALYSIS

The issue before the court is the RMV of the ninth building for tax years 2005-06 through 2008-09, inclusive. The valuation evidence focused on the January 1, 2005, assessment date for the 2005-06 tax year.

RMV is defined by statute as "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year." ORS 308.205.[3] "When the determination of real market value * * * is an issue before the tax court, the court has jurisdiction to determine the real market value * * * on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

There are three methods used to determine RMV: the cost approach, the income approach, and the sales comparison or market approach. *Allen v. Dept. of Rev.* (*Allen*), 17 OTR 248, 252 (2003). All three approaches must be considered, although "it may be that all three approaches cannot be applied" for a particular property. OAR 150-308.205-(A)(2)(a). "[W]hether in any given assessment one approach should be used exclusive of the others or is preferable to another or to a combination of approaches is a question of fact to be determined by

---

[3] All references to the Oregon Revised Statutes (ORS) and the Oregon Administrative Rules (OAR) are to 2005.

the court upon the record." *Pacific Power & Light Co. v. Dept. of Revenue* (*Pacific Power*), 286 Or 529, 533, 596 P2d 912 (1979).

Plaintiffs relied on the cost approach and income approaches, with primary reliance on the cost approach. Defendant relied on the cost approach, market approach, and income approaches, with primary reliance on the market approach.

A.      *Highest and Best Use*

Plaintiffs did not submit any information regarding the highest and best use of the property. Defendant analyzed the highest and best use of the property and concluded that "[t]he four criteria that must be met are legal permissibility, physical possibility, financial feasibility, and maximum productivity. The subject property meets all these requirements and has the highest net return as improved." (Def's Ex C at 8.) The court accepts Defendant's conclusion.

B.      *Burden of Proof*

As the party seeking affirmative relief, Plaintiff bears the burden of proof. ORS 305.427. "[A] preponderance of the evidence mean[ing] the greater weight of evidence, the more convincing evidence[,]" is sufficient to sustain the burden of proof. *Feves v. Dept. of Revenue*, 4 OTR 304, 312 (1971) (citation omitted). The evidence presented must be competent evidence, and evidence that is inconclusive or unpersuasive is insufficient to sustain the burden of proof. *See Woods v. Dept. of Rev*., 16 OTR 56, 59 (2002); *Reed v. Dept. of Rev*., 310 Or 260, 265, 798 P2d 235 (1990). In order to sustain the burden of proof, Plaintiff must provide competent evidence supporting its determination of the RMV.

C.      *Cost Approach*

Both Plaintiffs and Defendant analyzed the value of the ninth building using the cost approach. " 'In the cost approach, the value of a property is derived by adding the estimated

value of the land to the current cost of constructing a reproduction or replacement for the improvements and then subtracting the amount of depreciation * * * in the structure from all causes." *Magno v. Dept. of Rev.* (*Magno*), 19 OTR 51, 55 (2006), citing Appraisal Institute, *The Appraisal of Real Estate* 63. "[A]ctual costs are relevant and often persuasive, but not controlling. That is because the task is to determine market value and, although different contractors may build the same [property] for differing amounts, the completed [property] may sell for the same amount of money regardless of how much it cost to build." *Murray v. Tillamook County Assessor*, TC-MD No 090154C, WL 602442 at *2 (Feb 19, 2010). "The cost approach is 'particularly useful in valuing new or nearly new improvements,' * * * However, the cost approach is less useful where the evidence of cost is incomplete, distorted, or otherwise unreliable." *Magno*, 19 OTR at 55.

In *Magno*, the taxpayer provided "extensive evidence" that showed the costs she incurred in remodeling her property, including the financial records prepared by her business. *Id.* The work on taxpayer's property was mostly performed by her, her partner and company employees. *Id.* at 57. The county alleged that the "taxpayer's cost estimate [was] unsound" because the "taxpayer did not pay market price for the remodel." *Id.* at 56. The court noted that the reliability of the taxpayer's evidence was placed in some doubt because the taxpayer's partner testified that he had failed to account for some costs and, as the county pointed out, some other costs "appeared to be missing from taxpayer's cost estimate." *Id.* Ultimately, the court concluded that the taxpayer's "cost estimate [was] uncertain and unreliable" based in part on the "incomplete and confusing nature of the evidence[.]" *Id.* at 58.

The court finds that Plaintiffs here failed to meet the burden of proof with respect to their value under the cost approach. Plaintiffs' reported cost of $23,445 was as of January 2000, and

was not time adjusted to January 1, 2005. Plaintiff did not provide evidence to support the material and labor costs listed on the "Proposal." A proposal is like an estimate, in that it is not proof of what was paid, and Plaintiffs provided no evidence to show the cost actually paid. Furthermore, there was disagreement among the witnesses as to the cost of the concrete slab. Saccato testified that the cost to install a 2,600 square foot concrete slab is roughly $1.80 per square foot, or $4,680. Lif disagreed and testified that a typical concrete slab costs between $3 and $5 per square foot, or $7,800 to $13,000 for the subject building. No evidence was provided to support either witness's estimate.

Lif valued the building under the cost approach using the Marshall & Swift Valuation Service. (Def's Ex. C at 8.) Categorizing the ninth building as a "metal component class S rank 1 building[,]" Lif calculated a price per square foot of $19.44 or $50,500. (*Id.*) Lif did not include the current cost modifier or local cost modifier in his appraisal report, which precluded Plaintiff from checking the accuracy of Defendant's methodology. Furthermore, Lif admitted he had not verified the accuracy of the software program used to run his calculations. Accordingly, the court does not place any weight on Defendant's income approach.

D.    *The Income Approach*

Both parties analyzed the real market value of the ninth building using the income approach. The income approach "relies on the assumption that a willing investor will purchase a property for an amount that reflects the future income [that the property will produce]." *Allen v. Dept. of Rev.*, 17 OTR 248, 253 (2003). "A basic requirement of the income method is fixing an annual income to capitalize." *Pacific Power*, 286 Or at 540. The Oregon Supreme Court "decided that the flow of income to be determined is that which 'would be anticipated by reasonable, knowledgeable buyers and sellers as of the assessment date[.]' " *Pacific Power*, 286 Or at 541-42, citing *Mt. Bachelor v. Dept. of Rev.*, 273 Or 86, 539 P2d 653 (1975). Although there are two

techniques for determining the expected future income, direct capitalization and discounted cash flow, both appraisal reports relied upon the direct capitalization approach to determine the subject property's RMV.

Plaintiffs analyzed the RMV using the income approach primarily to support their value under the cost approach. To calculate gross income, Plaintiff multiplied "13 units x $70/mo x 12" for a total of $10,920, and then used an occupancy rate of 30 percent to determine a effective gross income (EGI) of $3,276. (Ptfs' Ex PE-8.) Plaintiffs then applied a 40 percent expense ratio to arrive at an NOI of $1,966 (as corrected by the court), which they capitalized at 9 percent. (Ptfs' Ex PE-7.)

In *Heritage N.W. Properties LLC v. Deschutes County Assessor (Heritage)*, the taxpayer "did not provide 'historical gross income or expenses' for the subject property other than the total income and expenses as of December 31, 2008. Plaintiff did not provide rental rates for comparable properties. Plaintiff did suggest a capitalization rate, but did not provide comparable sales to support that rate." *Heritage*, TC-MD 100703C, WL 1103821 at *4 (Mar 25, 2011). As a result, the court found that taxpayer "did not establish by a preponderance of the evidence its requested real market value for the subject property as of January 1, 2009." *Id*.

The court here finds that Plaintiffs did not provide evidence of historical rental rates or occupancy rates for the subject property because Plaintiffs provided no documentation to support using a rental rate of $70 per month or an occupancy rate of 30 percent. Additionally, Plaintiffs did not provide rental rates or occupancy rates for other comparable properties. Plaintiffs also failed to provide evidence to support using a 40 percent expense ratio and a capitalization rate of 9 percent from 2009 for a January 1, 2005, assessment date. No evidence was provided to support Gerlt's testimony that using an 8 percent capitalization rate would accurately account for

the time difference from January 1, 2005 to the 2009 BOPTA recommendation. Accordingly, the court finds that Plaintiffs have failed to meet the burden of proof with respect to its indicated value under the income approach.

Defendant also used the income approach to calculate the value of the ninth building. To calculate gross income, Defendant averaged Plaintiffs' profit and loss statements from 2003 through 2006, and arrived at a gross income average of $67,333. (*See* Ptfs' Ex PE-6-6C) Post-assessment date sales can be used to demonstrate market value unless there is reason to believe that "the condition of the property at the time of assessment was any different than it was at the time of the subsequent sale." *Sabin v. Dept. of Rev.*, 270 Or 422, 428, 528 P2d 69 (1974) n 11; *see also Truitt Brothers., Inc. v. Dept. of Rev.*, 10 OTR 111 (1985). Here, the post-assessment data can be used to review Plaintiffs' profit and loss income. However, the court finds that calculation problematic as Defendant included two years of post-assessment data in its calculation of the forecast gross income.

Defendant calculated a capitalization rate of 7.5 percent from 16 sales comparables. Lif testified that he did not time adjust the sale comparables to 2005, or adjust for lack of yard improvements, or for topography. The court finds that, as a result, the capitalization rate derived from the sales comparables is unreliable. Accordingly, the court does not place any weight on Defendant's income approach.

E.    *The Sales Comparison Approach*

Defendant conducted a sales comparison approach to determine the RMV of the ninth building. Plaintiffs did not present a sales approach. "Under the sales comparison approach, the value of a property is derived by 'comparing the subject property with similar properties, called comparable sales.' * * * That comparison is based on many factors, and adjustments are made for any differences between the comparable sales and the subject property so that the appraiser can

derive a value for the subject property." *Magno*, 19 OTR at 58 (citations omitted). Thus, "[t]he court looks for arm's length sale transactions of property similar in size, quality, age and location * * * in order to determine the real market value" of the subject property. *Richardson v. Clackamas County Assessor*, TC-MD No 020869D, WL 21263620 at *3 (Mar 26, 2003).

Lif used 10 sale comparables dated March 26, 2002, to September 26, 2008, from Douglas County to calculate an RMV for the ninth building. (Def's Ex C at 20, 26.) Lif testified that he started with total complex values and subtracted out the land value and made miscellaneous adjustments to determine a building residual. The building residual was then divided by the total square feet to determine a price per square foot. Lif determined a mean price per square foot of $23 for sales from 2002-2005 and a mean price per square foot of $35 for sales from 2005-2008. (*Id*.) Lif concluded a total value of $22.50 per square foot, or $58,500, under the market approach. (*Id*. at 10.)

"In evaluating the comparability of sales to a subject property, one measure of comparability is the relationship measured as a percentage between the total amount of the adjustments and the sales price. The general rule is that the lower the percentage adjustment, the closer the comparable sale is to the subject property." *Burrill Resources Inc. v. Jackson County Assessor*, TC-MD 100324D, WL 2409726 at *5 (June 9, 2011). The net adjustments made to the 10 sale comparables exceeded 50 percent of the sale price. The court finds that the net adjustments for Defendant's sales show the lack of comparability for those parcels to the subject property.

Lif testified that his "best comparable" was the "Riddle Self Storage" property. However, Lif admitted that the Riddle property, unlike the subject property, was not on a hill, was partially paved, and was surrounded by razor wire. Lif also testified that the sale comparables were not time adjusted to 2005, nor were adjustments made for yard improvements.

Additionally, Gerlt questioned the accuracy of the land values, specifically noting the difference between the land value of $150,000 used for Winston Mini Storage on Lif's spreadsheet, and the stated land value of $167,714 on the Winston Mini Storage Commercial Sales Verification sheet. (Def's Ex C at 26, 27.) The court finds that Defendant's calculation is unreliable given the questions raised as to the accuracy of the values. Accordingly, the court does not place any weight on Defendant's sales approach.

### III. CONCLUSION

After carefully considering the evidence, the court concludes that Plaintiffs have failed to prove by a preponderance of the evidence that the values on the rolls for the 2005-06 tax year are in error. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal is denied and the real market value for the subject property, part of Account R37121, as of January 1, 2005, is as currently set forth on the rolls, which is $58,500.

Dated this ___ day of March 2012.

DAN ROBINSON
MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Magistrate Dan Robinson on March 28, 2012. The Court filed and entered this document on March 28, 2012.*