IN THE TAX COURT OF THE
STATE OF OREGON

LES SCHWAB TIRE CENTERS OF OREGON, INC.
*v.*
CROOK COUNTY ASSESSOR
*and*
DEPARTMENT OF REVENUE,
*Intervenor*
(TC 4337)

LES SCHWAB WAREHOUSE CENTER, INC.,
*v.*
CROOK COUNTY ASSESSOR
*and*
DEPARTMENT OF REVENUE,
*Intervenor*
(TC 4338)

SCHWAB PROPERTIES, LTD.,
*v.*
CROOK COUNTY ASSESSOR
*and*
DEPARTMENT OF REVENUE,
*Intervenor*
(TC 4339)

SFP-B LIMITED PARTNERSHIP
*v.*
CROOK COUNTY ASSESSOR
*and*
DEPARTMENT OF REVENUE,
*Intervenor*
(TC 4340)

Leslie B. & Dorothy J. SCHWAB
*v.*
CROOK COUNTY ASSESSOR
*and*

DEPARTMENT OF REVENUE,
*Intervenor*
(TC 4341)
SFP-A LIMITED PARTNERSHIP
*v.*
CROOK COUNTY ASSESSOR
*and*
DEPARTMENT OF REVENUE,
*Intervenor*
(TC 4342)

David L. Canary, Garvey, Schubert & Barer, represented Plaintiffs (taxpayers).

Crook County Assessor made no appearance.

Marilyn J. Harbur, Assistant Attorney General, Department of Justice, Salem, represented Intervenor (the department).

Decision for Plaintiffs rendered July 16, 1999.

### CARL N. BYERS, Judge.

In these consolidated cases, Plaintiffs (taxpayer)[1] appeal the July 1, 1997, real market value of a complex of buildings used in a tire distribution business. Both taxpayer and the Department of Revenue (the department) agree that the proper valuation approach is the replacement cost approach. However, they disagree on the size and cost of the

---

[1] Although there are a number of property accounts with different owners, all of the properties are used by Les Schwab Tire Centers of Oregon, Inc. Therefore, for convenience only, the court will discuss the issues as if the corporation alone is the taxpayer.

replacement, the amount of functional obsolescence due to excess operating costs, and other related issues.

## FACTS

The man whose name taxpayer bears was born and raised in Prineville. He is the leader and driving force of a business that, over the last 50 years, has grown from one tire store to the largest tire distribution business in the Northwest. As of the assessment date in issue, taxpayer had over 280 retail tire stores stretching from the northern border of Washington to Sacramento, California, and from the Pacific Ocean to the eastern border of Idaho. In addition, taxpayer owns: (1) a construction company, which builds its retail stores and other necessary buildings; (2) a fleet of trucks for hauling the tires, wheels, and auto parts to the retail stores; and (3) a recapping operation.

The subject buildings are all located in Prineville, a small town in central Oregon of approximately 6,500 people. Taxpayer's complex of buildings is the largest in the city and perhaps anywhere in Oregon east of the Cascades. There are nine warehouses at the main site, plus a production center for recapping, a shipping dock, a truck shop, a giant tire shed, and other improvements. Separated from this complex by the main street of Prineville are the corporate headquarters, computer building, and a training center.[2] The main site is physically limited because it is bordered on two sides by highways and is divided roughly in half by the Crooked River. Taxpayer constructed a one-lane bridge to provide access across the river. These limitations caused taxpayer to construct its newest warehouse, warehouse #10, in an industrial park approximately three miles away from the main site. By the department's measure, taxpayer has about 1,773,194 square feet under roof, while taxpayer claims the measure is 1,655,786 square feet. The actual number depends not only on how one considers the sheds, metal canopies, and awnings, which are attached to the buildings, but also the method of measurement used.

---

[2] The main site also includes an adjustment building and midway building. However, the adjustment building, the midway building, and training center are all excluded from this appeal because taxpayer is not contesting the assessed values assigned to those properties.

The parties agree that the highest and best use of the property is its current use, which is a mixture of administration, storage, distribution, and recapping. They also agree there is some functional obsolescence, but they disagree on the amount. The parties agree that the cost approach should be based on replacement cost rather than reproduction cost. Finally they agree that the size and extent of the complex is extraordinary for central Oregon and has no other apparent users.

### PLAINTIFF'S EVIDENCE

Employees of the company testified of its rapid growth in the last two decades. That growth and other circumstances caused property additions to be made on a piecemeal basis. Taxpayer was "forced" to expand across the river and build a bridge to provide access to what are now warehouses #8 and #9, the truck shop, and the main loading dock. Those major additions were not enough and shortly after that, taxpayer needed more storage capacity. In 1996-97 it constructed warehouse #10 in an industrial park three to four miles away.

Company personnel also testified that as of the assessment date in question, the ideal solution would be to replace the current 1,655,786 square feet with 1,130,000 square feet. This could be done by building adjacent to warehouse #10. Such a replacement facility, both in size and shape, would be more efficient. The replacement facility would save taxpayer operating costs by using fewer, better designed buildings that would also allow a more efficient use of labor and equipment.

Kent Osborne, appraiser, performed taxpayer's replacement cost approach appraisal. He relied on company personnel for cost information. He believed that information was reliable because taxpayer had just finished constructing warehouse #10 and the truck shop. He adjusted this cost up by 8 percent to account for interim financing. He also relied upon taxpayer's estimate of necessary storage space of 980,000 square feet. Likewise, he appears to have relied upon taxpayer's estimate that the production area of approximately 150,000 square feet could be replaced with 100,000 square feet. Osborne used a recognized valuation service to

calculate physical depreciation. He then relied upon tax-payer's estimate of 20 percent savings in labor and equipment costs to achieve an annual savings of $878,327 after tax. He discounted this by an almost risk-free rate of 6.6 percent over 20 years to arrive at his estimates of functional obsolescence.

Larry Tapanen testified with regard to the sales comparison approach. He considered some 272 sales of mega-warehouses nationwide and a study compiled by a national real estate appraisal organization concerning 33 mega-warehouse sales. Based on this information, he concluded that a warehouse of 1,655,786 square feet would sell for approximately $9.80 per square foot. He also considered three sales and one offer in Oregon. Only one sale appeared somewhat comparable and that indicated a value of approximately $5 to $7 per square foot. Tapanen testified that the sales comparison approach could only show what would not be the value of the subject property. That is, the subject's value should not be between $19 and $25 per square foot. He believes that while the results are somewhat "inconclusive," the indicated range of $5 to $7 per square foot is "supportive" of the cost approach. Taxpayer's replacement cost approach indicated a value for the subject properties of $11,600,000. Tapanen and Osborne, using $6 per square foot from the sales comparison approach, adjusted the cost approach down by 14 percent to arrive at a reconciled estimated value of $10,000,000.

## DEFENDANT'S EVIDENCE

Carla Owings, appraiser for the department, also used a replacement cost approach. However, in her view tax-payer uses all of the space except warehouse #1 and, therefore, the replacement would be just as large. Using cost-calculator factors supplied by a recognized valuation service, she found a total replacement cost of $47,181,933 for 1,721,704 square feet. She also added 8 percent for "soft costs" such as financing, resulting in a figure of $23.79 per square foot for warehouses. She believes this figure is supported by a new Wal-Mart distribution center built in Hermiston at a cost of $42.42 per square foot. She stated that this was "a very strong comparable."

Dean Schmidt, appraiser for the department, calculated functional obsolescence. He measured the aisles and storage racks, and he estimated "excess" travel distances for employees due to the location and configuration of the buildings. He determined that there was a total of $515,550 annual excess operating costs. Reducing this by taxpayer's overall tax rate gave him net excess operating costs of $309,330. He discounted that amount by 11 percent for 20 years, resulting in $2,463,296 of functional obsolescence.

Due to the location of the properties, both sides considered external or economic obsolescence. Taxpayer's appraisers testified that economic obsolescence exists but that it is not sufficiently quantifiable to estimate. The department's appraisers performed calculations to demonstrate that there is no economic obsolescence. Because neither party applied any economic obsolescence, the court will not discuss that issue.

## ANALYSIS

One of the first questions to answer is whether there is an "immediate market" for the subject property. ORS 308.205(2)(c)[3] indicates that if the property has no immediate market value, then the test to be applied is the amount that would justly compensate the owner for loss of the property. While this court has previously indicated that just compensation is premised on the concept of "value in exchange," it looks at value from the seller's perspective, rather than the buyers. *See Truitt Brothers, Inc. v. Dept. of Rev.*, 10 OTR 111 (1985).

There was some dispute between the parties as to whether the property is to be valued for loss to the owner and whether the property is a special use property. With over 1,600,000 square feet of mostly warehouse in a small city in central Oregon, neither party suggests that the evidence shows any "immediate" market value. The court finds that there are no comparable sales or rentals within a reasonable distance, time, and proximity and therefore no "immediate" market for the subject property.

---

[3] All references to the Oregon Revised Statutes are to 1997.

While the court finds that the statistics of sales of mega-warehouses provide a background, they are not sufficient evidence on which to base an estimate of value. Tapanen testified that such data indicates the subject is "atypically large" and would sell for $5 to $10 per square foot including land. That information is of little use because it indicates that taxpayer's new warehouse #10, which cost $18 per square foot, and the new Wal-Mart distribution facility, which cost $42 per square foot, would each sell for between $5 to $10 per square foot, including land. Such an amount is not reasonable nor would it be just compensation to the owners.

In estimating replacement cost, taxpayer assumes it could replace 1,655,786 square feet with 1,130,000 square feet. Most of that reduction in size is in the warehouses, replacing 1,285,409 square feet with 980,000 square feet, and in production, replacing 150,000 square feet with 100,000 square feet. In short, taxpayer believes it could use a replacement facility that is 525,000 square feet or over 30 percent smaller than its actual facility. In contrast, the department assumes a replacement facility of 1,721,704 square feet on the theory that taxpayer is using all of its space except warehouse #1.

The dispute over the warehouse space is primarily based upon taxpayer's practice of stacking tires on pallets. Taxpayer assembles tires on pallets into stacks approximately 60 inches high. In taxpayer's view, the ideal height of the building would allow taxpayer to stack the pallets five high for an efficient use of forklifts and employees. The newest warehouse #10 was designed for stacking five high. The department's appraisers assert that the current warehouses #1 through #9 are high enough to allow stacking five high. However, based on the fact that taxpayer does not stack tires five high in those warehouses, the court concludes that taxpayer is correct.

Taxpayer claims it can also save space by adjusting column spacing and aisle widths and eliminating some fire walls and smoke curtains. However, the evidence submitted was more conclusionary than specific. The court is not persuaded that taxpayer's theoretical replacement facility,

which is 525,000 square feet smaller than the subject property, could provide the same utility. After studying taxpayer's Exhibit 21, comparing stackable space to area, the court finds that a replacement warehouse would have to be at least 1,080,000 square feet in area. That would provide 5,427,000 in stacking square feet, which is less than the 5,523,036 available in the existing subject property. The difference of 96,036 stacking square feet is equivalent to 19,207 square feet of area. That is a reasonable amount of area that could be saved due to changes in column spacing, aisle width, and fire walls. The replacement warehouses would therefore be 205,409 square feet smaller than the existing subject warehouses.

■ The primary dispute over replacement *cost* centers upon the quality of construction. Based on all the evidence, the court finds taxpayer's estimates are the most accurate. Taxpayer's actual cost for recently constructed buildings is more persuasive than estimates. Also, the department's estimates are based on higher classifications than appear to be appropriate. In addition, due to inexperience, the department's appraiser made a number of errors, including doubling-up on modifiers and doubling-up on interest. The same appraiser viewed the Wal-Mart facility as a very strong comparable. The court finds that it is not a good cost comparable due to the number of truck doors and higher quality of construction.

Taxpayer's appraiser indicated that it was "easy to see how" the production facilities could be reduced from 150,000 to 100,000 square feet and accomplish the same function. The court does not find it easy. No specific evidence was introduced regarding how the production facilities were laid out nor how the existing production facilities could fit into 33 percent less space. Conclusionary statements are of no assistance to the court. Production is not just storage. Increasing the height of the buildings may not do anything to reduce the number of square feet needed for operation of machinery and equipment.

The court finds that the appropriate replacement size and cost is as follows:

| Warehouses | - 1,080,000 sq ft @ $18.70 per sq ft | = $20,196,000 |
|---|---|---|
| Production | - 149,824 sq ft @ $18.70 per sq ft | = $ 2,801,709 |
| Truck Shop | - 20,000 sq ft @ $38.17 per sq ft | = $ 763,4000 |
| Office/ Administration | - 50,000 sq ft @ $ 64.83 per sq ft | = $ 3,241,500 |
| | Total Replacement Cost | = $27,002,609 |

The court accepts taxpayer's estimates of physical depreciation, which are less than the department's estimates overall, and finds that the physical depreciation is as follows:

| Warehouses | - 10 percent | Production | - 16 percent |
|---|---|---|---|
| Truck Stop | - 2 percent | Office/Administration | - 18 percent |

■ In considering the issue of functional obsolescence, it is appropriate to review some basics. The cost approach is based on the principle of substitution. That principle assumes a buyer will not pay more for an existing property than it would cost to construct a replacement. The purpose of deducting functional obsolescence is to indicate the loss in value in the existing property due to its deficiencies when compared to a possible new replacement.

Functional obsolescence is defined as:

> "Functional obsolescence is caused by a flaw in the structure, materials, or design of the improvement. It is attributable to defects *within* the property, as opposed to external obsolescence, which is caused by external factors. Functional obsolescence may be curable or incurable. Functional obsolescence can be caused by a deficiency, which means that the subject property is below standard in respect to market norms. It can also be caused by a superadequacy which means that the subject property exceeds market norms." *The Appraisal of Real Estate*, 379 (11th ed 1996). (Emphasis in original.)

Although the definitions used by the parties vary in wording, they are not different in concept.

Taxpayer claims functional obsolescence based on two points. First, to the extent that the subject improvements

could be replaced by a smaller facility, taxpayer incurs excess operating costs with regard to utilities and insurance for the larger subject improvements. Second, the number of buildings, their locations and configurations are not ideal. They could be replaced by two large warehouses, a truck shop, and an administration building. Consequently, the existing facilities require extra labor and equipment to move materials around. The costs of that excess labor and equipment constitute excess operating costs.

■     The court has theoretical concerns with the claims of excess operating costs because defects in design are usually within a single structure. Defects in the layout of a complex of buildings can only be a source of functional obsolescence if the highest and best use of the complex is for a specialized purpose, such as manufacturing wood products. If the complex could be used for other purposes that do not suffer because of the layout, then there would be no functional obsolescence. In such a case, which use is the highest and best use depends upon which use results in the highest *net* value. For example, if excess operating costs cause the value of a complex used as a wood processing center to be less than the value when used for some other purpose (because those other uses do not incur excess operating costs), then the highest and best use would be for the other uses.

     In this case, the subject properties are used as a distribution center for a tire distribution business. Taxpayer claims that warehouses #2 through #9 are deficient in design because they are too low to stack tire pallets five high. An efficient design allows stacking tire pallets five high and gains other efficiencies by eliminating walls for better design and layout. However, warehouses are not single-purpose buildings. Warehouses may be used to store all kinds of products or property. They are also often used for conducting retail and wholesale businesses. The question is, then, although the subject warehouses are deficient from taxpayer's point of view, would the market view them as deficient?

■■     Extraordinarily, the parties appear to agree on this issue. Defendant's appraisal report points out that the subject properties were built for use by taxpayer and were "not designed to accommodate multi-tenant uses." Rather, the

properties were "designed and built without consideration for marketability." In general, the court agrees with regard to warehouses #1 through #9. Their respective sizes, shapes, spatial relationships, and configurations make it unlikely that they could be used by a number of separate owners or tenants. Consequently, their use by a single owner or tenant has a high probability of incurring the excess operating costs that both parties recognize. Further, the department's appraisal states:

> "The subject property is adapted to, and has unique characteristics for, the current owner-user. According to listings and recorded leases, the market demand for single users of rental properties approaching 2,000,000 square feet is virtually nonexistent, even when considering a very broad geographical area."

Based upon the above, the court finds that use of the properties at the main site incurs excess operating costs that give rise to functional obsolescence. The court will consider the three categories claimed by taxpayer.

(1) Excess Building Costs

The court has found that an appropriate replacement facility would contain 1,299,824 square feet. This is 355,962 square feet less than the actual 1,655,786 square feet currently used by taxpayer. This difference can be multiplied by .15 cents per square foot to determine excess utility costs of $53,394 per year. It can also be multiplied by 15.7 cents per square foot to arrive at the excess insurance costs of $55,886 per year. That results in a total of $109,280 excess building operating costs per year.

(2) Excess Labor Costs

Taxpayer claims $1,201,408 excess labor costs based upon saving 20 percent of its 160 distribution center employees. That assumes 32 full-time employees are required due to the deficiencies in design and layout. Taxpayer's appraiser generally described the sources and estimates, but general descriptions are not very satisfactory or persuasive. He gave no specifics and relied more on impressions than measurements. A company employee testified that there are 20 excess employees; eight moving between the distribution center and

warehouse #10, two moving back and forth across the bridge, five on the day shift, and five on the swing shift.

■     The court finds that the eight employees who move between warehouse #10 and the distribution center are not required due to any deficiency in the property. Warehouse #10 is a new building. Taxpayer's own witnesses indicated it contained no deficiencies. The location of warehouse #10, on top of the hill, was a choice of business operations. It is not an inherent or integral part of the distribution center. One must ask, if taxpayer opened a warehouse in Tacoma, then would the travel between it and Prineville be considered functional obsolescence? Taxpayer may incur greater business operating costs to use warehouse #10, but such costs are not due to any deficiencies in any of the properties. Those costs are due to the size of taxpayer's business.

The evidence submitted by both parties with regard to excess labor due to building layout and configuration was not very satisfactory. Taxpayer submitted no specific measurements. However, despite the weak evidence, the court concludes that some functional obsolescence exists.

The court finds that 12 full-time employees is a reasonable estimate of the excess labor incurred by taxpayer. Using taxpayer's figures, 12 full-time employees earning an average of $18.05 per hour and working 2,080 hours per year, gives an indicated total excess labor cost of $450,528.

(3) Excess Equipment Costs

Taxpayer claimed excess equipment costs based on 20 percent savings and labor. Because taxpayer assumed 32 excess employees and the court finds only 12 excess employees, only 7.5 percent of the monthly equipment costs are excess. Multiplying the monthly costs of $35,702 by 7.5 percent equals $2,678 per month or $32,132 per year.[4]

The present value of excess operating costs or the amount of functional obsolescence, is calculated as follows:

[1] The court's determination of excess labor costs and excess equipment costs combined is $482,660, which is less than the department's combined estimate.

Excess Building Costs   =   $109,280
Excess Labor Costs     =   $450,528
Excess Equipment Costs  =   $  32,132

Total Excess Operating Costs = $591,940
Less Taxpayer's Overall Tax Rate (39.3% x $591,940) = $232,632
Net Excess Operating Costs = $359,308

The net amount of excess operating costs must then be discounted for a period of time to find their present value. The parties agree that an appropriate discount period is 20 years. The parties do not agree on an appropriate discount rate. Taxpayer's appraisers use 6.6 percent, which is considered almost a risk-free rate. The department's appraisers use 11 percent, which is their estimate of taxpayer's weighted average cost of capital. Hal Heaton, a professor of finance, testified that excess operating costs should be discounted at a very low rate because the certainty of payment makes the risk very low. He demonstrated the balance required in the relationship between risk and rate, indicating that the discount rate for expenses must be lower than the rate for net cash flow. In his opinion, the discount rate for excess operating costs should be "close to treasury bond rates."

Although Heaton's example is instructive, it assumes the value of the property in order to determine the appropriate discount rate. Here, the court must determine the value of the property *and* the discount rate. The department's evidence of taxpayer's weighted average cost of capital indicated it was approximately 10.93 percent, or 11 percent rounded. That same exhibit shows the cost of debt at 8.2 percent. If the typical industry cost of debt is 8.2 percent, then, as Heaton correctly indicated, the discount rate for excess operating costs of that industry should be less than 8.2 percent. The payment of excess operating costs is more certain and, in some respects, has priority over general debt. Although there is no evidence to indicate how much less the discount rate should be, based on the evidence submitted, the court finds that 6.6 percent is a reasonable discount rate.

Functional obsolescence may then be calculated by discounting the net excess operating costs of $359,308 by 6.6

percent for 20 years. That calculation indicates a value of $3,927,782. The indicated value of the subject properties, by the replacement cost approach, can then be calculated as follows:

| | | |
|---|---|---|
| Replacement Cost | = | $27,002,609 |
| Less Physical Depreciation | = | $  3,066,611 |
| Less Functional Obsolescence | = | $  3,927,782 |
| Total Indicated Value | = | $20,008,216 or $20,000,000 rounded |

In summary, the court finds that the replacement cost approach is the only reliable indicator of value for the subject properties. Therefore, the court finds that the real market value of the subject properties, excluding the specific improvements withdrawn from the appeal, as of July 1, 1997, was $20,000,000. Taxpayers to recover their costs and disbursements.