IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| BARBARA ELLISON, | ) | |
| | ) | |
| Plaintiff, | ) | TC-MD 120314D |
| | ) | |
| v. | ) | |
| | ) | |
| CLACKAMAS COUNTY ASSESSOR, | ) | |
| | ) | |
| Defendant. | ) | **DECISION** |

Plaintiff appeals the 2011-12 real market improvement value of property identified as

Accounts 00817012 (Parcel 31W2102701) and 00816941 (Parcel 31W2101900) (subject

property).[1]  A trial was held in the Oregon Tax Courtroom, Salem, Oregon, on February 25,

2013.  Jack Orchard, Attorney at Law, appeared on behalf of Plaintiff.  Glen R. Crouch (Crouch),

MAI, ARA, Real Property Consultants Salem, testified on behalf of Plaintiff.  Kathleen J.

Rastetter, Senior County Counsel, Clackamas County Counsel, appeared on behalf of Defendant.

Matt Healy (Healy), Senior Appraiser, Clackamas County, testified on behalf of Defendant.

Plaintiff's Exhibit 1 and Defendant's Exhibits A through G were admitted without

objection.

## I.  STATEMENT OF FACTS

The subject property, called Wild Turkey Farm, is described by Plaintiff as a "world class

equine facility" committed "to excellence in sport horse breeding."  (Def's Ex A at 9.)  Healy

described the equine facility, stating that there "are essentially 4 buildings that constitute the

main portion of the facility and were built to exacting specifications such that there is a

---

[1] Plaintiff's Complaint appealed 5 other tax accounts that were withdrawn at trial:  00817012; 00817021; 00832736; 01218042; and 04001225.  The real market value of the land, two parcels of 66.1 acres and 74.21 acres, is not appealed.  (Ptf's Ex 1 at 6.)

protective order on the plans, specifications and construction costs due to the propriety [*sic*]
nature of these details." (Def's Ex A at 5.) He described the four buildings:

> "The largest of these is the arena which is approximately 32,128 square feet with
> a 5,525 square foot attached roof cover and a 561 square foot attached finished
> viewing room. The second is the training barn which is 16,960 square feet and is
> connected to the arena by a 1,100 square foot portico. The third is the stallion
> barn which is 9,337 square feet and the fourth is the mare barn which is 9,568
> square feet. * * * They are all new and constructed of very high quality materials
> both inside and out. * * * There is [*sic*] approximately 155,000 square feet of
> parking lots and roads connecting these buildings and the dwelling, extensive
> landscaping, a pond that is approximately 21,000 square feet and approximately
> 36,000 lineal feet of fencing."

(*Id.*) Healy's appraisal report and Crouch's appraisal report provided additional detail about
each of the four buildings. (*Id.*; Ptf's Ex 1 at 40-45, 51-53.) Crouch stated that a shop building
and manufactured home are located on the subject property. (Ptf's Ex 1at 51.) The subject
property appealed included a "large, custom built" residence that "was built over the course of
several years with construction starting in 2007 and ending sometime in 2010." (Def's Ex A at
4.) Crouch and Healy provided detailed descriptions of the 9,192 square foot residence.[2] (Ptf's
Ex 1 at 45-50; Def's Ex A at 4-5.) Each appraiser included numerous photographs of the subject
property in their appraisal reports. (Ptf's Ex 1 at 17-23; Def's Ex A at 14-43.) Each appraiser
supplemented their report with testimony.

### 1 *Highest and Best Use*

The parties agreed that the subject property's highest and best use as improved is "a very
elaborate and high end home and horse breeding facility as to tax lot 1900 and a second homesite
and stable, shop and manufactured home." (Ptf's Ex 1 at 37, 57.) Healy stated that "[i]t is legal,
was built specifically for that purpose by the Plaintiff, is being used for that purpose by the
Plaintiff and results in the highest value to the Plaintiff." (Def's Ex A at 45.)

---

[2] Healy's appraisal report stated that the residence was 9,855 square feet. (Def's Ex A-49.)

Both Crouch and Healy considered the three approaches to valuation: cost, income and comparable sales. (Ptf's Ex 1 at 58; Def's Ex A at 46.) Both appraisers concluded that the income approach was not an acceptable approach. (Ptf's Ex 1 at 106; Def's Ex A at 46.)

2. *Sales Comparison Approach*

Crouch testified that he relied on the sales comparison approach. (Ptf's Ex 1 at 108.) To determine the Plaintiff's residence real market value, Crouch identified nine comparable properties and described his analysis as "straightforward":

> "The Assessor's real market value of the land is subtracted from the sale price. The building residual is then divided by finished living area square footage in the main house only. That price on a per square foot basis can then be related to the subject property.
>
> "The sales are compared to the subject and the amenities considered. In this price range, buyers expect very elaborate kitchen facilities, lots of custom woodwork, and expensive site amenities, as well as a guest house or apartment."

(*Id*. at 80.) Crouch testified about each comparable property. The gross living area for those nine properties ranged from 5,983 square feet to 9,843 square feet with sale prices ranging from $1,495,000 to $2,647,000. (*Id*. at 90.) Crouch concluded that "[i]t is absolutely clear that there is no justification for pricing a custom house at anything over $200 per square foot," * * * "which is at the very high end." (*Id*; 105.) He testified that his conclusion is confirmed by the "resale" of the comparable sale properties. (*Id*. at 81, 82, 85, 87.) Crouch determined the residence's real market value to be $1,838,400. (*Id*. at 105.)

Defendant questioned Crouch about the sales, noting that two of the comparable sales were built in six months in contrast to the subject property that was built over a number of years, questioning whether comparable sales 2, 4, and 5 were arm's length transactions and asking if Crouch made adjustments for age, size, location, quality, or other distinguishing features, citing OAR 150-308.205-(A)(2)(c). In response, Crouch stated that even though he did not make

quantitative adjustments, he made a qualitative evaluation. The parties dispute that the subject property is a "class 8 property." Crouch testified that he thinks Defendant has "overclassed" the subject property, stating that the subject property lacks a central stairway in the foyer and does not have a large exercise room or entertainment room. Defendant asked Crouch if he was aware that the Oregon Department of Revenue directs that "[r]ural land must be valued by the average price per acre based on the size of the parcel," citing to OAR 150-308.205-(A)(2)(h), and noting that tax roll values "does not equate with real market value." (Def's Ex G.)

After determining Plaintiff's residence real market value, Crouch determined the real market value of the horse barns, mobile home, and shop. (Ptf's Ex 1 at 105.) To determine the real market value of the horse barns, Crouch selected five "horse farm" properties and two listings and testified about each. (*Id*. at 91 – 104.) He concluded:

> "The preceding sales simply won't support a value of more than $20 per square foot for horse barns, although these barns cost far more than that, even the 2007 sale. The mobile home value is $40 per square foot and the shop $15 per square foot.

> "Some of the problems associated with the subject barns is that there are simply too many of them. Money has been spent where it adds little to the value of the property. Examples include the tongue and groove ceilings in the box stall areas. If this were in central Oregon or central Washington, the insulation and heating in the stables and box stalls would be desirable. In western Oregon, it is simply not that cold. There are numerous other examples as well."

> "The real problem is a combination of gross over-building and market conditions. * * *."[3]

(*Id*. at 104-05.) Crouch determined a real market value of $1,113,620 for the arena, stables, and

/ / /

/ / /

---

[3] Crouch's report stated: "These barns were built by someone with a passion for very expensive and highly bred and trained horses. Costs were wildly over the top[.]" (Ptf's Ex 1 at 108.)

hay barn, $228,480 for the horse barns; $27,000 for the shop and $76,680 for the mobile home. (*Id*. at 105.)

Defendant questioned Crouch about each comparable property, noting characteristics about each property (e.g., age, size, location, rental of residence) and questioning whether sales 12, 13, and 14 were arm's length transactions. Crouch testified that he did not inspect the comparable properties, stating he "relied on RMLS" and noting that many of the properties are "gated."

For his sales comparison analysis, Healy selected four properties that sold and two listings, making various adjustments to the sale prices of each including a substantial adjustment of more than $13 million for the "equine facility" to each of the properties that sold. (Def's Ex A at 47 – 49.) He testified that "a large adjustment reduces the reliability" of the property as being comparable to the subject property. The adjusted sale prices ranged from $19,024,421 to $21,201,046. (*Id*. at 49.) Healy concluded that "Sale #1 and both listings were given most weight. #1 is similar in location, riverfront site, size and sold relatively close to the assessment date. The listings have equine facilities that appear to be somewhat similar to the subject. This market data indicates a market value of $18,500,000 for the subject property." (*Id*. at 48.) (Emphasis omitted.)

3.    *Cost Approach*

Both parties determined the subject property's real market value using the cost approach. The parties agreed that replacement rather than reproduction cost "is appropriate to valuation simply because spending more money than necessary doesn't create value, it merely wastes money." (Ptf's Ex 1 at 66.) Crouch agreed that Healy "correctly compute[d] the replacement

/ / /

cost new estimates for the various improvements using the Marshall Swift Valuation Service." (*Id*. at 72.) Healy determined an improvement real market value of $13,992,070 (tax lot 1900) and $4,283,342 (tax lot 2701) for the subject property. In response to questions, Healy testified that he used the Marshall and Swift Valuation Service and the Oregon Department of Revenue local cost modifiers to determine replacement cost and that value was "in line with Plaintiff's costs."

Crouch stated that "[t]he difference between the actual cost and the Assessor's estimates of replacement cost new is attributable to depreciation due to superadequacy. This is functional obsolescence and it is incurable." (Ptf's Ex 1 at 72.) Crouch testified that after reviewing sales of comparable properties he concluded:

> "Depreciation is clearly evidenced among the improved residential sales and less so among the horse breeding operations which have sold. For high value residences, especially in this size category, depreciation runs two-thirds, or 0.67. That is, one could sell a house for 33 [cents] on the dollar of cost, as of the appraisal date."

(*Id*. at 75.) Crouch was questioned as to why he selected 67 percent when the comparable sales reflected 33 to 50 percent; he stated that the comparable sales reflected 39 to 75 percent and he selected the higher percent because the residence is "oversized." Crouch testified with respect to the horse barns an appropriate depreciation rate was 75 percent of cost. Crouch was asked why he attributed the "entire decrease" to improvements, rather than allocating between improvements and land. He responded that he did not analyze land value and relied on "land values stated in multiple listings" but he did agree that land values decreased between 1999 and 2011. Using the cost approach, Crouch determined an improvement real market value of $3,606,181. (*Id*. at 77.)

/ / /

/ / /

4.    *Reconciliation*

Crouch concluded that "the comparison approach is reliable, and the cost approach produces a high value conclusion." (Ptf's Ex 1 at 108.)  Crouch stated that "[t]he cost approach overstates subject value as of the appraisal date, and even yet.  The situation is even more profound with respect to the horse farm facilities." (*Id.*)

Healy concluded that "there appears to be very narrow market" for the subject property:

> "In valuation scenarios where there is little to no market for a property, ORS 308.205 * * * is clear[:] *(c)If the property has no immediate market value, its real market value is the amount of money that would justly compensate the owner for loss of the property.*  The cost approach is considered a reliable measure of 'just compensation' and is considered the best value indicator in this case."

(Def's Ex A at 90.)  In response to questions, Healy testified that "there appear to be no buyers for the subject property" and he was not aware of any other properties in the county that had "no immediate market value."

Plaintiff's appraiser determined a total improvement real market value of $14,591,127 before depreciation and Defendant's appraiser determined a total improvement real market value of $18,275,412.  (*See* Ptf's Ex 1 at 77-78; Def's Ex A at 60.)

## II. ANALYSIS

The issue before the court is the subject property's real market value as of January 1, 2011.  In Oregon, all real property "not exempt from ad valorem property taxation or subject to special assessment shall be valued at 100 percent of its real market value." ORS 308.232.[4]

The parties agree that the highest and best improved use of the subject property is its current use:  Plaintiff's personal residence and a world class equine facility.  There is no evidence in this case that as of the assessment date the current use was not viable or would not continue.

---

[4] All references to the Oregon Revised Statutes (ORS) and Oregon Administrative Rules (OAR) are to 2011.

ORS 308.205(1) defines real market value as:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

Defendant alleges that the subject property has no immediate market value and directs that the court determine the subject property's real market value in accordance with ORS 308.305(2)(c) that provides:

> "If the property has no immediate market value, its real market value is the amount of money that would justly compensate the owner for loss of the property,"

In defining "no immediate market," this court has concluded that if "there are no comparable sales or rentals within a reasonable distance, time, and proximity," then there is "no immediate market" for the subject property. *Les Schwab Tire Centers v. Crook County Assessor*, 14 OTR 588, 594 (1999).

Both appraisers considered the comparable sales approach. The comparable sales approach "may be used to value improved properties, vacant land, or land being considered as though vacant." *Chambers Management Corp v. Lane County Assessor*, TC-MD No 060354D at 6 (Apr 3, 2007) (quoting Appraisal Institute, *The Appraisal of Real Estate* 335 (12th ed 2001)). ORS 308.205(2) provides in pertinent part that "[r]eal market value in all cases shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue." The Department of Revenue adopted OAR 150-308.205-(A)(2)(c), stating that:

> "In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions. * * *."

The subject property is a custom residence with more than 9,000 square feet of living space and an equine facility, including arena and multiple barns measuring more than 57,000

square feet, located on approximately 140 acres. (Ptf's Ex 1 at 6, 45-58.) The appraisers were unable to locate actual market transactions of comparable properties that matched the subject property. Plaintiff's appraiser divided the subject property into two categories: custom residence and horse farm. He combined his determination of each category's real market value to determine the subject property's real market value. Plaintiff's appraiser failed to follow the methods and procedures adopted by the Oregon Department of Revenue. Plaintiff's appraiser did not adjust any of the actual market transactions (residence or horse farm), failed to appraise the land and failed to verify each transaction. Defendant's appraiser took a similar approach but followed the methods and procedures adopted by the Oregon Department of Revenue Oregon, selecting the sale of four custom residences and adding to those adjusted sale prices the subject property's real market value for equine facilities using the cost approach.

After considering comparable properties, each appraiser reached a different conclusion with respect to immediate market. Plaintiff's appraiser concluded that there was an immediate market and Defendant's appraiser concluded that there was not an immediate market. The court agrees with Defendant.

The subject property was designed to meet Plaintiff's specific needs or wants, not to appeal to the marketplace. Plaintiff's appraiser's appraisal report repeatedly confirms this conclusion, stating "[t]he house was built to the taste of the owner"; "[t]his home reflects a casual living style and may or may not appeal to high end buyers, especially those interested in horses"; "buyers in this market really don't want any more than a 6,000 sq. ft. house, with a single arena and stable"; "[t]he subject house is indeed a bit quirky"; "a fortune was spent on the cabinetry because it was all custom done * * * [t]hat need not have been the case"; and "[t]hese barns were built by someone with a passion for very expensive and highly bred and trained

horses * * * [c]osts were wildly over the top[.]" (Ptf's Ex 1 at 75, 76, 90, 105, 108.)  The subject property's real market value cannot be determined by looking to the market.

To determine the real market value when there is no immediate market, the applicable approach to determine "the amount of money that would justly compensate the owner for loss of the property" is the cost approach, the income approach, or a combination of those approaches. *STC Submarine, Inc. v. Dept. of Rev.*, 13 OTR 14, 21 (1994).  In this case, the parties have concluded that the income approach is not applicable and there is no evidence and testimony relevant to the income approach.  Both appraisers' appraisal reports included the cost approach.

Both appraisers relied on Marshall Valuation Services to determine the subject property's replacement cost.  The appraisers differed on the square footage of the residence and equine facility and the cost per square foot for the residence, arena and barns.  The parties did not reconcile their difference in square footage and the subject property's certified plans were not submitted as evidence.  The parties did not submit evidence to support their determination and reconcile their difference of price per square foot even though each agreed that the use of the Marshall Swift Valuation Service was correct.  Specific improvements were valued in one appraiser's appraisal report and not the other's appraisal report.  Defendant's appraiser listed exercisers and fencing in his cost approach and Plaintiff's appraiser listed a mobile home. Plaintiff's appraiser determined that the residence cost should be depreciated 67 percent and the equine facility cost should be depreciated 75 percent.  Plaintiff's appraiser determined the depreciation factor based on the market.  Having concluded that there is no immediate market for the subject property, the court disallows Plaintiff's appraiser's depreciation adjustment based on the market.

/ / /

Plaintiff's appraiser determined a total improvement real market value of $14,591,127 before depreciation and Defendant's appraiser determined a total improvement real market value of $18,275,412. (*See* Ptf's Ex 1 at 77-78; Def's Ex A at 60.) The court lacks sufficient evidence to reconcile the differences in the square footage and price per square foot for each type of improvement (residence, arena and barn) determined by each appraiser. There is insufficient persuasive evidence for the court to determine the subject property's real market value using the cost approach.

## III. CONCLUSION

After careful consideration of the testimony and evidence, the court concludes that there is no immediate market for the subject property and the subject property's real market value must be determined using the cost approach. Even though both appraisers' appraisal reports included the cost approach, there is insufficient evidence for the court to reconcile the appraisers' differences in the subject property's square footage and the price per square foot for each type of improvement to determine the subject property's real market value as of the assessment date. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied.

Dated this ____ day of April, 2013.

_____
JILL A. TANNER
PRESIDING MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*
*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This Decision was signed by Presiding Magistrate Jill A. Tanner on April 23, 2013.  The court filed and entered this Decision on April 23, 2013.*