IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| DAIMLER TRUCKS NORTH AMERICA LLC, | ) | |
| | ) | |
| Plaintiff, | ) | TC-MD 230255R / 230259R |
| | ) | |
| v. | ) | |
| | ) | |
| MULTNOMAH COUNTY ASSESSOR, | ) | |
| | ) | |
| Defendant. | ) | **DECISION** |

Plaintiff appealed the Multnomah County Board of Property Tax Appeal orders, mailed April 12, 2023, for Accounts R540494, R540481, and R672244, for the 2022-23 tax year. A trial was held on September 24 and 25, 2024, at the Oregon Tax Court. Alex Robinson, an attorney with CKR Law Group, P.C., appeared on behalf of Plaintiff. Owen Bartels (Bartels), an appraiser with NW Value Consulting, testified on behalf of Plaintiff. Carlos Rasch, Assistant County Counsel for Multnomah County, appeared on behalf of Defendant. Mark Pomykacz (Pomykacz), an appraiser with Federal Appraisal LLC, testified on behalf of Defendant. Plaintiff's exhibits PE1 to PE479 (including corrected pages) and Defendant's exhibits DE1 to DE222 were received into evidence. Post-trial briefs were received on November 14, 2024.

## I. STATEMENT OF FACTS

### A. *Overview*

The subject properties consist of three office buildings commonly referred to as Nova, TEC, and Corp 9. Located on the south side of Swan Island in Portland, Oregon, the subject properties are owned and operated as part of Plaintiff's corporate headquarters campus. They are situated within the Portland/Vancouver metropolitan statistical area (MSA). (PE10.) Nearly half of Oregon's population resides within this MSA. (PE11.)

1. *Nova building*

The Nova building is a nine-story, owner-occupied, Class A office facility constructed by Plaintiff in 2016. (DE31-DE33.) The building contains approximately 267,280 square feet and is located on a 10.38-acre parcel in a predominately industrial area. (*Id*.; PE5.) A 242,720 square foot, four story, parking garage was constructed with the building and serves all the subject properties, although additional surface lots exist for the other buildings. (PE5.)

The Nova building includes high-end carpet tile, tiled restrooms, drop-acoustical tile ceilings with LED lighting, and painted gypsum walls – that Plaintiff characterizes as very good quality finishes. (PE24). The entrance features a two-story atrium containing a showcase truck, a small café, meeting rooms and workstations scattered throughout. (PE25-PE27.)

2. *TEC building*

Plaintiff acquired the TEC building, originally constructed in 1977, and substantially remodeled it in 2016. (PE141) The building has approximately 215,104 square feet of office space and on an 11.6 acre parcel. As of the assessment date, the building had some failing façade, which was noted in Plaintiff's report as diminishing value. (PE141.)

3. *Corp 9 building*

The Corp 9 building was originally constructed in 1986 as a research and development facility. (PE361.) Corp 9 includes approximately 58,938 square feet and is located on a 4.98-acre parcel. (PE357.) Plaintiff purchased the property in 1999, later expanding and repurposing it as part of its headquarters campus. (PE357.) As of the assessment date, the building housed Plaintiff's daycare operations, a shipping and receiving bay, and open-format office space. (*Id*.) Although the northern portion of the building was initially designed as an indoor sport court for employees, it was ultimately converted to additional office space. (PE 365.)

4.    *Land valuation and appraisal information*

The parties agreed to the land values; therefore, land valuation was excluded from the appraisal reports. Although located on separate tax lots, all three buildings are physically contiguous, owned by Plaintiff, and function as an integrated corporate headquarters campus. While Plaintiff submitted three standalone appraisals for the properties, it acknowledged their operational integration. Defendant submitted a single appraisal treating the buildings as one special purpose property.

B.    *Plaintiff's Appraisal Methodologies and Conclusions*

1.    *Nova building*

Bartels testified that he is a Certified General Appraiser with over 20 years of experience, prepared appraisal reports for each of the three buildings. (PE3.) For the Nova building, he developed the cost, sales comparison, and income capitalization approaches. He concluded that the highest and best use of this building was continued use as a corporate office facility. (PE35-PE36.) The appraisal did not treat the building as special purpose, despite acknowledging its integration into the larger campus. (*Id*.)

Bartels testified that market feedback suggested that the Covid-19 pandemic had a negative impact on value; however, on cross examination he testified that available sales data did not confirm this as of the assessment date. (PE13.) He identified the potential buyer pool as regional and national owner-users.

a.    Cost approach - Nova

Plaintiff's actual construction cost for Nova was approximately $128.9 million. (PE43.) Adjusted using Federal Reserve Bank economic data, the estimated cost to build as of the assessment date was $152.8 million. (PE45.) Using the Marshall & Swift valuation data, Bartels

estimated the replacement cost at $116.4 million, deducted $20.6 million for depreciation, added the assessor's land value of $10.9 million, and concluded a cost-based value of $99,348,794.[1] This approach was given the least weight due to limitations in market-derived depreciation estimates for such a specialized structure. (PE41-PE48).

The actual cost for the parking garage was $20,642,648, while Marshall & Swift data estimated the cost at $16,699,136. (PE43, PE46.) Bartels estimated the surface lot cost at $7.50 per square foot and structured parking cost at $69 per square foot. (*Id.*)

b.     Sales comparison approach - Nova

Bartels analyzed ten sales of comparable properties, adjusting for location, age, quality, and parking. (PE49-PE68) Five of the comparable sales were located in the Seattle MSA, three in the Portland MSA, and one in Phoenix, Arizona. He acknowledged the differences between these markets but maintained that the comparables were appropriate, despite adjustments averaging around 50 percent. Adjusted prices ranged from $89 to $448 per square foot. (PE67.) Bartels concluded a reconciled value of $85,530,000, or approximately $320 per square foot. (PE69.)

Of the ten comparable sales, Comparable 5 included a confirmed parking structure; the nine properties had surface lots or lacked parking data. (PE53–PE62.) The subject property's parking garage, at 242,720 square feet, accommodates 1,380 cars and 12 motorcycles—equating to 6.57 spaces per 1,000 square feet of building area. (PE23, PE29.) Bartels did not assign a separate value to the parking garage, which had an actual construction cost of $20.6 million. (PE43.)

---

[1] Bartels conceded on cross-examination that he incorrectly calculated the height of the building, and his numbers should have increased by .5% for every floor above three.

c.       Income approach - Nova

Market rent was estimated at $24 per square foot, with a 15 percent vacancy rate and a 6.5 percent capitalization rate. (PE88.) After applying expenses and reserves, the income approach yielded a value of $87,260,000. (*Id*.)

d.       Reconciliation - Nova

Bartels gave primary weight to the sales comparison approach and secondary weight to the income approach. (PE89) He considered the cost approach to have limited utility due to rapid increases in construction costs. He concluded a total value for the Nova building at $86 million. (*Id*.) He allocated this value as follows: $73,903,320 for R672244; $11,469,100 for R699546; and $627,580 for R699099. (PE90.)

2.   *TEC building*

Bartels developed only the sales comparison and income capitalization approaches for the TEC building, and he excluded the cost approach due to the building's age. (PE183.) He concluded that the highest and best use of the building was continued use as a corporate office facility. (PE176-PE180)

Bartels used the same set of comparable properties as for the Nova building. (PE67; PE203.) Adjusted sales prices ranged from $73.72 to $368.23 per square foot. (PE203.) He initially valued the property at $225 per square foot, or $48,398,400, but applied a downward adjustment of $9.63 million for deferred façade maintenance. (PE205) Bartels included a report on the façade, with repair estimates ranging from $5.3 million to nearly $13 million. (PE286-PE289.) He considered the cost of repair to have increased due to inflation—estimated at 46 percent—and applied the $9.63 million adjustment as a lump-sum depreciation factor. (PE170.) Although Plaintiff undertook substantial renovations to the building in 2016, it did not repair the

façade. (PE141.) After analysis, Bartels concluded a value using the sales comparison approach of $38,770,000, or $180 per square foot. (PE227.)

For the income approach, Bartels selected five comparable leases. (PE208.) Four were located in the Portland MSA and one in Seattle. (*Id.*) He noted that the subject property was larger than all of the comparables and that lease rates varied significantly. (PE216.)

Bartels estimated market rent at $20 per square foot, yielding gross potential income of $4,302,080. (PE219.) After applying a 15 percent vacancy rate, 3 percent for management, 1.18 percent for reserves, and a cap rate of 6.75 percent, plus the deferred maintenance deduction, he concluded a value of $42,280,000. (PE226.)

Bartels reconciliation gave greater weight to the sales comparison approach. He concluded a final market value of $40 million. (PE227.) He allocated the value as follows: $27,367,000 for R540494; and $12,633,000 for R699098. (*Id.*)

3.     *Corp 9 building*

Bartels applied only the sales comparison and income approaches for the Corp 9 building. (PE357.) He concluded that the highest and best use of the property was continued office use, consistent with its current occupancy. (PE361.) He did not consider the daycare or shipping functions to indicate special purpose use. (PE409.) Based on comparable office buildings of similar age and use, Bartels concluded a value of $8.25 million, or $140 per square foot. (*Id.*)

For the income capitalization approach, Bartels selected four comparable properties located in the Portland MSA. (PE412; PE 421.) He estimated market rent at $16 per square foot, yielding gross income of $943,008. (PE427.) After applying a 7 percent vacancy factor, a 7.25 capitalization rate, and deductions for expenses, he concluded a value of $8.160 million. (*Id.*)

Bartels gave primary weight to the sales comparison approach because he believed that approach is "most indicative of pricing applied by owner-users." (PE428.) Bartels gave the income capitalization approach secondary weight "only because of the subject's owner-user nature and the limitation of data [regarding office leases of the subject property's size and of capitalization rate indications]." (*Id.*) His reconciliation value was $8.225 million allocated as follows: $5,927,160 for R699547; and $2,297840 for R540481. (PE361 Corrected.)

C.      *Defendant's Appraisal Methodologies and Conclusions*

Pomykacz is the managing partner of Federal Appraisal LLC and holds the MAI designation from the Appraisal Institute. (DE107.) He has over 35 years of experience in complex commercial property valuation and litigation support, including corporate headquarters and special purpose campuses. (*Id.*)

Pomykacz developed the sales comparison and cost approaches. He did not apply an income approach due to insufficient market data for special purpose headquarters campuses. (DE57-DE58.)

1.      *Sales comparison approach*

Pomykacz selected six property sales, all within the Portland central business district (CBD). (DE65.) Based on a comparison chart where he made adjustments, Pomykacz determined the value of the land and improvements was $340 per square foot or $275,000,000. (DE67.) He subtracted the land only value of $30,656,840, which left $244,343,160 for improvement only value. (*Id.*) He made 15 percent location adjustments for all properties due to their CBD location. (DE68.) He made size adjustments ranging from 18 to 34 percent. Total adjustments ranged from 25 to 55 percent. (*Id.*)

/ / /

Pomykacz valued the entire site – approximately 27 acres with over 530,000 square feet of office and special functional space – as a single, integrated corporate headquarters. (DE3-DE5; DE25.) He did this citing the interdependence of buildings, shared parking, LEED certification (Nova), and cohesive functionality. (*Id.*) He testified the market for such campus was extremely limited, constituting a "market of one" and asserted that breaking it into standalone buildings would misrepresent market conditions. For this reason, Pomykacz explained his valuation relied significantly on the cost approach. On cross examination, he indicated that his valuation reflected the value to the current user, and that a potential buyer would likely not pay an amount equivalent to the cost of construction. He stated: "if any corporate campus or headquarters sells, I would expect it to sell for less than the cost to build it."

2. *Cost approach*

Pomykacz primarily relied on the cost approach using Marshall & Swift Valuation Service, which allows estimates of the replacement cost new for all three buildings and the parking garage. For Nova, he estimated the cost per square foot at $360.50. He then added sprinkler costs and applied a cost multiplier based on the building's height. Finally, he included a 12 percent entrepreneurial profit, arriving at a replacement cost new of $119,034.545. (DE79.) Although he determined the building's age was 6 years of a 60 year life, he deducted depreciation of 2 percent, leaving a value of $116,653,854. He added $23,569,303 for the four-story parking lot, $2,730,124 for landscaping, and $188,130 for a surface parking lot, for a rounded total of $143 million. (*Id.*)

For the TEC building, Pomykacz estimated a cost per square foot of $259, added for sprinklers and cost multipliers, and 12 percent for entrepreneurial profits, for a total cost of $63,422,185. (DE80.) Although the actual age of the facility was 25 years, he determined the

effective age was 17.67 years. (*Id.*) He deducted 8 percent for depreciation, added landscaping, and a surface parking lot, to arrive at a rounded total of $61 million. (*Id.*)

For the Corp 9 building, Pomykacz used a base square foot rate of $203, added sprinklers, added a local multiplier and entrepreneurial profit of 12 percent to find replacement cost new at $12,977,166. (DE81.) He determined its actual age at 36 years, its effective age at 25.33 of a 55 year economic life, and deducted 19 percent physical depreciation. (*Id.*) Pomykacz did not apply a deduction for obsolesce in valuing the property, which is currently used as a daycare. He added landscaping, surface parking, playground area for a rounded total of $12 million. (*Id.*)

In his final reconciliation, Pomykacz placed all of the weight on the cost approach, citing the difficulty in estimating a precise market rent for special purpose headquarters and the absence of sufficient market transactions to make valuation determinations with high confidence. (DE83.) His conclusions were described as follows:

> "The Subject property is a corporate campus. It is owner occupied, designed and built for the owner's specific real estate needs. These buildings function as one economic unit. They include special designs and finishes that support the corporate function. They can be described as special improvements and as having special purposes and needs that go beyond general office buildings that are intended to be rented. The Subject improvements cannot be directly compared to rental office buildings. Appraisal theory indicates that special, rare property types are often better appraised via the cost approach."

(DE83.)

## II. ANALYSIS

The central issue in this case is the real market value of the subject properties for the 2022-23 tax year. Specifically, the court must determine whether the properties should be valued individually as conventional office buildings, as Plaintiff contends, or collectively as a special purpose corporate headquarters campus, as Defendant contends. This determination turns on the

properties' highest and best use, the behavior of market participants, and whether the properties meet Oregon's definition of special purpose property. Secondarily, the court must determinate whether the parties met their respective burdens of proof.

Under ORS 308.205(1),[2] real market value is defined as:

> "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

The assessment date for the 2022-23 tax year was January 1, 2022. *See* ORS 308.007; 308.210. A property's highest and best use requires considering property that is legally permissible, physically possible, financially feasible, and maximally productive.

Importantly, Oregon adheres to a value-in-exchange standard, as clarified in *STC Submarine, Inc. v. Dept. of Revenue*, 320 Or. 589 (1995). This approach values property based on what the market would pay, rather than its value to the current owner —a concept known as value in use. See *The Appraisal of Real Estate*, 15th ed., at 52-54.

As the party seeking to reduce the tax roll value, Plaintiff, bears the initial burden of proof. Defendant, seeking to increase the roll value, bears the burden of proof on that issue. ORS 305.427. The applicable standard is a preponderance of the evidence. *Id*. Importantly, the court must determine the value in exchange, not the value in use, and must evaluate the properties from the perspective of a hypothetical market participant, not the current user. *See Truitt Brothers, Inc. v. Dept. of Rev.,* 10 OTR 111, 114 (1985).

Oregon law recognizes that certain properties, commonly referred to as "special purpose properties," may require alternative valuation methods when there are few buyers or comparable sales. *See Les Schwab Tire Centers of Oregon v Crook County Assessor*, 14 OTR 588 (1999);

---

[2] References to the Oregon Revised Statutes (ORS) are to the 2021 edition.

ORS 308.205(2)(c); OAR 150-308-0240(3).[3] Under ORS 308.205(2)(c), if a property has "no immediate market value," its real market value is the amount that would justly compensate the owner for its loss. To justify special purpose treatment, the proponent must demonstrate that the property's physical, functional, or legal characteristics of the buildings make them not readily adaptable to general market uses, thereby limiting the potential buyer pool. *Les Schwab*, 14 OTR at 593 (requiring evidence that property's marketability is materially constrained).

A.      *Factors Favoring a Special Purpose Asset Designation*

The parking garage serves multiple buildings and is physically and functionally integrated into the site. This integration complicates the independent marketing of the buildings, as a hypothetical buyer of one building may depend on shared parking rights that are not easily severed. Additionally, the use of part of the Corp 9 building as a daycare is atypical for general office space. While this use could be repurposed, it may deter conventional office tenants or buyers. Corp 9's relatively small size, at approximately 59,000 square feet, and specialized design reduce its comparability to standard multi-tenant office buildings.

B.      *Factors Favoring Separate Valuation*

Despite the features noted above, the evidence does not support treating the properties as a single special purpose asset. Plaintiff constructed the Nova building but acquired the TEC and Corp 9 buildings later. They were not originally developed as a unified corporate campus; the buildings had some prior functional independence. Defendant did not identify structural characteristics that render the buildings unsuitable for general office use. Rather, Pomykacz, emphasized their current use, which improperly shifts the analysis toward value in use rather than value in exchange.

---

[3] Oregon Administrative Rules (OAR)

Although the daycare use is unusual, it comprises a minor portion of the overall property portfolio. No evidence was presented to show that conversion to general office use would be a prohibitive expense. These factors suggest that the buildings retain market adaptability and independent utility, undermining Defendant's argument for treating them as an inseparable special use property.

In *Les Schwab Tire Centers v Crook County Assessor*, 14 OTR 588, 594 (1999), this court considered whether a large warehouse complex used for tire distribution had an "immediate market." *Id*. at \*3. The court concluded that it did not, noting the absence of comparable sales or rentals. While the court accepted the property as a single unit for valuation, it did so based on the parties' agreement, not because segmentation was impractical or due to functional integration. *Id.* at 590–94.

Oregon Department of Revenue rules further clarify that where no comparable market transactions exist, it is appropriate to rely on the cost or income approaches. *See* OAR 150-308-0240(2)(d). Special purpose property is defined as property specially designed and used for a specific operation, often lacking market comparable. OAR 150-308-0240(3). However, the absence of comparables alone does not justify special purpose treatment; the property must also lack adaptability to general market uses.

Pomykacz emphasized that the physical proximity, operational integration, and exclusive use of the buildings by Plaintiff made it appropriate to value the subject property as a special purpose headquarters facility. He cited shared amenities such as the common parking garage and daycare in Corp 9 as evidence of a single economic unit. However, these features, even in combination, do not establish the degree of integration required for special purpose designation. Most critically, Pomykacz's appraisal relies heavily on the property's current use, which aligns

more closely with a value-in-use standard, contrary to ORS 308.205(1). While Defendant raises valid concerns about the campus-like nature of the subject properties, Plaintiff's approach better aligns with the statutory definition of real market value. Thus, the court determines the subject properties should be evaluated separately and not as a unit.

C.      *Whether Plaintiff Has Met Its Burden of Proof*

Plaintiff submitted separate appraisal reports for the Nova, TEC, and Corp 9 buildings, treating each as a conventional office property. Each report applied standard valuation methods, including the sales comparison and income capitalization approaches. The Nova appraisal also included a cost approach. All three reports concluded that the highest and best use of the properties was continued office use and did not identify any physical or regulatory barriers to independent sale or marketing.

While Bartels acknowledged errors in some summary tables, his overall analysis was generally persuasive. For the Nova building, he concluded a sales comparison value of $320 per square foot. Pomykacz's valuation of the entire campus at $340 per square foot is not materially different. However, the treatment of the parking garage represents a significant divergence. Bartels assigned no value to the parking garage, despite its documented construction cost of over $20 million. Only one of the ten sales comparables included a parking garage, and that facility offered significantly fewer spaces. The subject property provides 6.57 spaces per 1,000 square feet of building area—well above market norms. Despite this, Bartels made no adjustment for the parking garage. The court finds this omission unjustified. While it cannot simply add $20 million to the sales comparison value, the absence of any valuation or adjustment for such a substantial asset undermines the reliability of the Nova appraisal. Given the lack of a viable alternative valuation and the acknowledged limitations of the cost approach, the court concludes

that Plaintiff has not met its burden of proof with respect to the Nova building.

For the TEC building, Bartels concluded a value of $225 per square foot, or $48,398,400. (PE204.) He applied a $9.63 million deduction for deferred façade maintenance. However, this adjustment was not adequately supported. While Plaintiff provided cost estimates, it did not submit contractor bids or explain why the repairs were neglected during prior renovations. The court finds the valuation of the building persuasive overall but gives no weight to the additional depreciation adjustment. Accordingly, the value of the TEC building is determined to be $48.4 million.

For the Corp 9 building, Bartels applied both the sales comparison and income capitalization approaches. He concluded that the highest and best use of the property was continued office use, consistent with its current occupancy. He did not treat the daycare or shipping functions as indicative of special purpose use. (PE409.)

Bartels' sales comparison approach yielded a value of $140 per square foot, or $8.25 million. The comparables selected were generally similar in age and use, though none included the same mix of functions as Corp 9. The building's relatively small size—approximately 59,000 square feet—and its prior use as a research and development facility, later converted to include daycare and shipping operations, make it somewhat atypical. However, the evidence did not establish that these features materially constrained its marketability or adaptability for general office use.

The income approach supported a similar valuation. Bartels estimated market rent at $16 per square foot, applied a 20 percent vacancy factor, and used an 8.75 percent capitalization rate. After accounting for expenses, he concluded a value of $8.16 million. (PE427.)

In reconciliation, Bartels gave primary weight to the sales comparison approach and

concluded a final value of $8.225 million, allocated between two tax accounts. (PE428.) The court finds this valuation reasonable and supported by the record. While the building's mixed-use character may limit its appeal to some buyers, there was no evidence that it could not be marketed or repurposed without undue cost. Accordingly, the court accepts Bartels' valuation of $8.225 million for the Corp 9 building.

## III. CONCLUSION

The subject properties exhibit certain characteristics of an integrated corporate campus, including a shared structured parking garage and a limited-use daycare located within the Corp 9 building. These features suggest that separating the properties for valuation purposes may present logistical challenges. However, the evidence presented does not establish that the properties possess the physical, functional, or legal characteristics necessary to warrant classification as special purpose property. Further, Defendant did not demonstrate that the buildings lack market adaptability or that they are incapable of being independently marketed or sold.

With respect to the Nova building, Plaintiff's appraisal contains material deficiencies. Most notably, the appraisal fails to assign any value to the parking garage, despite its documented construction cost exceeding $20 million and its significant contribution to the functionality of the site. Given the absence of a credible valuation for this substantial asset and the acknowledged limitations of the cost approach, the court concludes that Plaintiff has not met its burden of proof as to the real market value of the Nova building.

As for the TEC and Corp 9 buildings, Plaintiff's appraisals contain some errors and insufficient support for certain adjustments, such as the deferred maintenance deduction for TEC. Nevertheless, Plaintiff's appraisals of these buildings are grounded in conventional valuation

methodologies and reflect the likely behavior of informed buyers and sellers in the relevant market. Accordingly, the court finds that Plaintiff's appraisals more accurately reflect the real market value of the TEC and Corp 9 buildings as of the assessment date with the exception of deferred maintenance of the façade, as referenced above. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is granted in part and denied in part. Neither party presented a persuasive value for the Nova building, thus the roll value is sustained. The value of the TEC building is $48.4 million, and the value of the Corp 9 building is $8.25 million.

RICHARD D. DAVIS
MAGISTRATE

*If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of this Decision or this Decision cannot be changed. TCR-MD 19 B.*

*This document was signed by Magistrate Richard D. Davis and entered on November 10, 2025.*