# IN THE OREGON TAX COURT

## TRUITT BROTHERS, INC.
*v.*
## DEPARTMENT OF REVENUE
(TC 2063)

James C. Griggs, Harland, Ritter, Saalfeld, Griggs & Gorsuch, Salem, represented plaintiff.

Dave L. Canary, Assistant Attorney General, Department of Justice, Salem, represented defendant.

Decision for plaintiff rendered August 7, 1985.

**CARL N. BYERS, Judge.**

This case concerns the true cash value of the major portions of plaintiff's food processing plant as of January 1, 1981. The plant is located on the bank of the Willamette River near the core of the City of Salem. The main processing building was originally constructed in 1914 and has been used since that time as a food processing plant. Due to changes in the industry and other circumstances, the plant has expanded by utilizing warehouses and parking spaces across Front Street. Although the prime connection with the warehouses across the street is an overhead conveyor system, the nature of the arrangement requires additional handling of empty and full cans. The main processing building contains a mezzanine area which is used for empty can storage and feeding into the system and a basement area, part of which was remodeled for use as an office and cafeteria.

The cannery primarily processes pears, green beans and stone fruits. It also produces a specialty, cherry jubilee. In the years just prior to the assessment date in question plaintiff found it necessary to essentially replace the pear line to retain its pear customers. Other additions and improvements since the owners purchased the property in 1973 have resulted in an up-to-date processing system. The primary deficiencies claimed by the plaintiff with regard to the machinery and equipment is not its age or efficiency but its cramped and circuitous layout which is dictated by the buildings in which it is located. For example, plaintiff claims that routing the pears through the basement in the course of processing them necessitates additional equipment, handling and clean-up. Plaintiff also claims that the canning industry has fallen on hard times and the plant values are diminished greatly by economic obsolescence.

This case is a classic illustration of the problems encountered in valuing industrial property for ad valorem tax purposes. The disparate positions of the parties, both in attitude and results, would leave reasonable men scratching their heads. Plaintiff's appraisers view the property as having value only to the extent it produces income or can be sold in the marketplace. Consequently, plaintiff's appraisers look at the projected income and consider what investors would pay

to obtain that benefit. Plaintiff compares these indications with the cost of replacing the plant from the used equipment market and the sale prices of other food processing plants which have sold. Defendant, on the other hand, does not believe that the sales of other food processing plants are comparable and looks for value which would "justly compensate the owner" for the loss thereof. Apprehensive about the "speculation" and difficulty involved in estimating value based on income, defendant relies primarily on a reproduction cost new, less depreciation, approach.

■ It is necessary to consider the value being sought. The relevant portion of the statute in effect on the assessment date in question provided as follows:

> "True cash value of all property, real and personal, means market value as of the assessment date. True cash value in all cases shall be determined by methods and procedures in accordance with rules and regulations promulgated by the Department of Revenue. With respect to property which has no immediate market value, its true cash value shall be the amount of money that would justly compensate the owner for loss of the property." (ORS 308.205.)

■ Market value means fair market value, which may be defined as "[t]he most probable price in cash, terms equivalent to cash, or in other precisely revealed terms, for which the appraised property will sell in a competitive market under all conditions requisite to fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under duress." American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 33 (8th ed 1983).[1] This value is commonly referred to in the appraisal field as value in exchange, or the value which property has for purposes of exchange.

■ An issue raised by this case is, if property has no "immediate market value," what is the concept of value being sought? Defendant contends for the concept of "value in use." (Defendant's Brief at 1.) An acceptable definition of value in use is:

---

[1] As revealed by the discussion in the text, "there is no 'universal' definition of market value." However, the traditional notions of willing buyer-willing seller appears to be commonly understood even by laymen.

"The value of an economic good to its owner-user which is based on the productivity (privacies in income, utility or amenity form) of the economic good to a specific individual; subjective value. May not necessarily represent market value." Boyce, *Real Estate Appraisal Terminology* 216 (1st ed 1975).

As inferred by the definition, value in use may exceed market value or value in exchange. For example, a property may be designed to produce a special product, the patent for which is held only by the owner of the property. Such a property would have little value to any other person but could be of great value to the owner of the patent.

However, the court does not believe that the legislature intended to apply two different value tests. To the contrary, it appears that the value sought under both conditions is "value in exchange" or market value. The direction that property is to be valued at its market value where it has an "immediate market" appears to be a statutory adoption of the comparable sales approach. This is consistent with the department's regulation which construes "immediate market value" to mean property for which there are existing comparable sales. OAR 150-308.205-(A)(1)(b).

■ If a property has no immediate market value, the test is the amount that would "justly compensate" the owner for loss of the property. No citations are needed for the assertion that "just compensation" is a condemnation law test. Further, it has long been the law in Oregon that "just compensation" means fair market value or "value in exchange." *Highway Commission v. Superbilt Mfg Co.*, 204 Or 393, 281 P2d 707 (1955). Defendant concedes that the focus is on appraising the physical property and excluding intangibles that might otherwise be included in value, such as goodwill, patent rights, etc. In the court's view, the statute is simply saying that if there is no immediate market, then the value of the property is to be estimated using a method other than the sales comparison approach. The value sought by those other methods, however, whether the income approach or cost approach, is nevertheless the value in exchange or market value. As noted by the Supreme Court in *Portland Canning Co. v. Tax Com.*, 241

Or 109, 404 P2d 236 (1965), the "dominant note" of ORS 308.205 is to reflect the value of the marketplace.[2]

In this case, then, the importance of determining whether an "immediate market" exists for the subject property relates to the methods of appraisal which are to be used or relied upon in determining the true cash value of the property. The department's regulation, OAR 150-308.205-(A)(1)(b), states: "Immediate market value of property exists when there are sales of comparable property at times and places which are reasonably relevant under the existing circumstances." In this case, the plaintiff offered evidence of five comparable sales. After weighing the evidence and considering the facts and circumstances of each sale, the court finds that only one is comparable.

The Castle and Cooke plant sold in April 1982, 15 months after the assessment date in question, for $5 million. However, negotiations for sale of the plant started near the assessment date. Although market conditions grew worse during the ensuing months, David Truitt testified that the market was already gloomy in 1981 and that the plaintiff could not have sold its plant for any reasonable amount. Other testimony indicated that the industry had identified "the problem" but was unaware of the extent of it until somewhat later. It appears to the court that the decline which occurred after the assessment date was not so great as to preclude the appraiser from making adjustments for comparability.

In *Sabin v. Dept. of Rev.*, 270 Or 422, 528 P2d 69 (1974), the Supreme Court approved the use of comparable sales occurring after the assessment date. In doing so, the court distinguished between: (1) facts which, if known as of the value date, would influence the value of the property, and (2) facts which are used to verify the opinion of value which is based on data known as of the valuation date.[3] While the sale

---

[2] It should be noted that in *Portland Canning Co. v. Tax Com., supra,* the court was not in fact ruling on the sales comparison approach. In effect, the case simply approved use of the used equipment prices in utilizing a cost approach to value.

[3] The court recognizes that because a comparable sale, if known, may influence a buyer as of the valuation date, the appraiser who looks back in time and desires to use a post-valuation date sale must, in the forming of his opinion of value, eliminate that as a fact which could have been known on the valuation date. The appraiser may use it only as corroboration of his opinion based on the facts which the hypothetical informed buyer could know on the valuation date.

could not have been considered by a potential buyer as of the assessment date, it can be used by an appraiser to verify his opinion which is based on facts which are known as of the assessment date.

The testimony indicated that the Castle and Cooke plant, while definitely superior and larger than the subject property, was in fact comparable to the subject. David Truitt considered the plant "totally comparable" and indicated that his company had made an offer to purchase the plant. It appears that the Castle and Cooke plant processed beans, pears, cherries and plums, much like the subject, and in approximately the same annual tonnage. (*See* Exhibit 13.) While there was some conflicting testimony as to the amount of the improvements made to the Castle and Cooke plant prior to its sale, on the whole it would appear to be as close a match as could be hoped for in such a specialized industry.

In evaluating the sale as a possible comparable, plaintiff's appraisers interviewed the parties on both sides and ascertained that the sale was negotiated at arm's length. Plaintiff viewed the seller as seeking to sell an operating facility and the buyer seeking to obtain pear processing capability as well as additional warehouse space. The court finds that it was purchased to be operated as an integrated facility.

The Castle and Cooke sale was rejected by defendant for various reasons. Defendant raised question about the actual consideration involved, pointing to the requirement that the buyer process pears which the seller was obligated to take from certain growers. In reviewing the evidence on this point, the court finds that, in light of the buyer's desire to get into the pear processing business and the absence of any evidence that such processing was not at market rates, this commitment had no value relative to the purchase price.

Defendant also rejected Castle and Cooke as a comparable sale because the seller had made it known that it would close the plant if it was not able to sell it as an operating facility. Defendant interprets this as the seller being "compelled to sell," thereby voiding the "willing seller" element of a market transaction. Mere motivation, however, is not compulsion. There is no evidence to indicate that Castle and Cooke, which is a large company, was unable to adopt other policies, such as continuing to operate the property or close the plant

and reopen later. The fact that the seller made a business decision to get out of the business is not compulsion.

Defendant's position seems inconsistent. Defendant's witness emphasized that his appraisal includes only the tangible, physical property and not any intangibles associated with the operating business. In view of this emphasized and correct position, it seems inconsistent for defendant to reject the sale of a whole "unit" (integrated industrial complex) because of a threat of closure. If the intangible enhancements of an operating business are to be eliminated, as they should be, the sale of an entire industrial unit should be the same whether it is operating or not. The court recognizes that often after an industrial plant is closed the sale of the "plant" takes the form of an auction of its various pieces and parts. An auctioning of the pieces and parts may legitimately be rejected by an appraiser as an indication of a plant's total, integrated "unit" value. However, when that total unit is sold as such, whether operating or not, it is a measure of the market value of the unit. In fact, it may be argued the sale is made better by the threat of closure because it eliminates the "going concern" or intangible elements while avoiding the auction route. This is particularly so where the plant is operated by the purchaser for two years after the sale.

It is an old adage that one sale does not make a market. The sales comparison approach assumes sufficient data or information to provide a pattern or range of indicated value. It is intended and assumed to reflect "the market" and not simply one or two buyers.

"When the market contains an insufficient number of transactions to create value patterns, the application of the approach may be limited or inappropriate. Large, special purpose properties are often insufficiently similar to other properties that have sold recently to allow an appraiser to impute value from them. For such properties, using one or both of the other appraisal approaches usually proves more reliable." American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 311 (8th ed 1983).

Although the market for industrial plants may be smaller and a sales comparison approach based on fewer sales, it appears that in this case primary reliance should be on other than the market comparison approach. Due to the difficulty of

distinguishing income attributable to the taxable property from income attributable to nontaxable and often intangible assets, it is rare, if ever, that the income approach can be used. Thus, primary reliance must be on the cost approach.

Both parties utilized the cost approach. Defendant used the reproduction cost new approach, looking to the used equipment market only for the purpose of estimating depreciation. Defendant did a detailed listing of all plant assets, adding for freight, installation, wiring and engineering on a percentage basis of 20 to 35 percent of the equipment's reproduction cost new. Defendant's appraiser estimated physical depreciation based on his experienced observation and measured functional obsolescence by the used equipment market, replacement cost and overall plant layout.

Plaintiff's machinery and equipment appraiser used the replacement cost used approach, obtaining costs from the used equipment market and adding amounts for installation, wiring and freight. Because the used equipment market theoretically already accounts for physical depreciation and functional obsolescence, plaintiff's appraiser estimated only system or overall functional obsolescence due to poor layout which resulted in excess operating costs.

While the details of the cost approaches of each party were subject to criticism by the other, as is to be expected when dealing in such voluminous detail, it appears that defendant's cost approach is the more reliable. Based on the evidence adduced, it appears to the court that a number of plaintiff's equipment listings are at auction or liquidation prices. This may have resulted from plaintiff's use of an "aggressive" rate for depreciation. In addition, much of plaintiff's estimated excess operating costs were based on estimates and not specific measurements which are required to support such deductions.

The primary reason for the wide disparity between the conclusions of value of the parties is that ghostly apparition called economic obsolescence. Like some spirit whose presence may be discerned but whose intangible nature defies measurement, it confuses and chills the marketplace. In this case, both parties agree that economic obsolescence is present in the improvements due to the fact that the land has a higher and better use than for a food processing plant. The parties'

estimate for economic obsolescence due to the land use ranges from $283,240 for defendant to $520,000 for plaintiff. Defendant denies that there is any other measurable economic obsolescence present. Plaintiff maintains that there is additional economic obsolescence present, which may be measured by the difference between the reproduction cost new (which represents the upper limit of value) and the "whole plant value" determined by the plaintiff from three approaches.

The three approaches utilized by plaintiff are basically a discounted cash flow analysis (income approach), a comparable company approach based on the perceived returns and prices of publicly traded food processing companies, and the market approach utilizing the Castle and Cooke sale and the Libby McNeil sale. The court can give but little credence to the income approach and virtually none to the comparable company approach. However, as indicated, the court views the sale of the Castle and Cooke facility as being a comparable sale and a valid indicator of value for the subject plant.

It is essential to keep in mind that the subject property under appeal is only a portion, albeit a major portion, of the Truitt Brothers cannery. This is significant because it requires additional adjustments in considering both the income and the market approach. For example, plaintiff points out that in valuing the whole Truitt Brothers cannery, you must add to defendant's appraised value of $7,445,890 the other income-producing assets which are not under appeal. Plaintiff contends this would result in a total value of $9,836,000. Plaintiff concludes this is unreasonable in light of the comparable sales of the Castle and Cooke and Libby McNeil plants.

■ One concern with utilization of or primary reliance on the cost approach is that it alone cannot measure economic obsolescence. There was substantial evidence presented by plaintiff concerning overall economic obsolescence in the industry. Defendant disputes that such economic obsolescence exists or that it can be measured. For example, defendant argues that the decline in the market may be offset by the decline in plaintiff's competition. Likewise, other expenses in other regions may counterbalance the northwest's higher freight and labor costs.

■ Appraisers for both sides found that the subject land

had a higher and better use than as a cannery site. It follows from this that the improvements are subject to economic obsolescence. Mr. Gill, testifying for plaintiff, valued the subject land at $517,000. He found that the total cannery land had a value of $720,500 and that a substitute or replacement site would cost only $200,000, resulting in economic obsolescence of $520,500. Defendant's appraiser Burnell used the true cash value of the assessment roll as of January 1, 1981, of $553,240 and found a replacement site would cost $270,000, resulting in indicated economic obsolescence of $283,240.

Generally, the evidence with regard to land value was unsatisfactory. The county appraiser Mr. Day relied on two sales in forming his opinion. While Mr. Gill had a number of sales, their comparability is questionable. The court finds that the preponderance of the evidence supports the true cash value on the roll of $553,240. To the extent that a replacement site could be obtained for less, there is economic obsolescence present in the improvements.

In the correlation process, the appraiser seeks to reconcile the indications of value from the different approaches into a single estimate of the value of the property. Here, in the court's opinion, the Castle and Cooke comparable sale is a valid indication of the market value of the subject property. While it cannot be relied upon alone, when compared to the value indicated by the reproduction cost new, it is persuasive evidence of economic obsolescence. After considering all of the evidence pertaining to the issue of economic obsolescence the court has concluded that plaintiff's estimate of economic obsolescence for the subject property is correct. Accordingly, plaintiff's estimate of overall economic obsolescence of $2,457,307[4] should be deducted from the depreciated reproduction cost of the improvements and machinery and equipment as found by the defendant. This finding includes the economic obsolescence resulting from the land having a higher and better use. While the inclusion of this element of economic obsolescence in the total may reflect some inexactness in the allocation of obsolescence, the overall result appears correct. The total economic obsolescence should be

---

[4] Plaintiff's estimate of total economic obsolescence was $2,755,500 (Plaintiff's Exhibit 14, at 99). That portion allocable to nontaxable assets should be excluded, leaving $2,457,307 to be deducted from the value of the taxable property.

applied (deducted from) the different classes of property in the same proportion as each class bears to the total. The computations are as follows:

| | Reproduction Cost Depreciated | Economic Obsolescence | True Cash Value |
|---|---|---|---|
| Buildings | $ 635,400 | $ 222,384 | $ 413,016 |
| Yard Improve. | 108,780 | 38,072 | 70,708 |
| Machinery & Equipment | 6,276,880 | 2,196,851 | 4,080,029 |
| Totals | $7,021,060 | $2,457,307 | $4,563,753 |
| Plus Land | | | 553,240 |
| Total | | | $5,116,993 |

Therefore, the Opinion and Order of the Department of Revenue is hereby set aside and the true cash value for the subject property as of January 1, 1981, shall be as set forth above. Costs to neither party.

## ON PETITION FOR REHEARING

Decision amended October 24, 1985.

## CARL N. BYERS, Judge.

Defendant filed a petition for rehearing seeking correction of the court's opinion which was entered in this case on August 7, 1985. The court agreed to hear arguments on two points raised in defendant's petition. Arguments of counsel were heard on October 18, 1985.

The first argument made by defendant concerned economic obsolescence attributable to the land by virtue of a different higher and best use. In its opinion, the court adopted defendant's estimate of depreciated reproduction cost (DRC) from which was deducted plaintiff's estimate of economic obsolescence. The court expressly indicated that this estimate of economic obsolescence included obsolescence arising from use of the land. In its petition for rehearing, defendant points out that the economic obsolescence attributable to land use had already been deducted from defendant's estimate of DRC and therefore the court's decision essentially doubles up on that aspect of economic obsolescence. In opposition, plaintiff argues that the economic obsolescence adopted by the court was determined by deducting plaintiff's whole plant value from plaintiff's DRC which took into account economic obsolescence due to land use. Plaintiff argues that if you change the amount of DRC, then the amount of economic obsolescence due to other than land use must change in the same amount.

■ It may be that in applying the cost approach, economic obsolescence due to land use should be considered in addition to economic obsolescence from other sources. Here, however, the economic obsolescence from other sources is measured by essentially accepting an indication of value from the market approach. Such a measure reflects economic obsolescence from all sources. To add economic obsolescence from all sources, as measured by the market approach, to economic obsolescence due to land use would appear to be a doubling up.

■ Acknowledging that the procedure is unusual, it is an attempt to accomplish a reconciliation or correlation of the indications of value. In this case the court has accepted defendant's DRC as the most reliable indication of the upper limit of value. At the same time, the court was persuaded that economic obsolescence is present in the industry and accepted

plaintiff's estimate of economic obsolescence. Plaintiff's estimate of economic obsolescence was based on the appraiser's judgment and analysis of all the data pertaining to that aspect of value. Although the court adopted the appraiser's estimate of economic obsolescence, it did not necessarily adopt all other conclusions and adjustments made by the appraiser. If the court were to make its own estimate of economic obsolescence, it would not give the same weight or make the same adjustments to the comparable sale and other indications of value.[1]

While more precise determinations might be made, the correlation process is not one of just "crunching the numbers." Appraising is an art because judgment must be exercised in all stages of the valuation process and because in reality property has a range of value.

After reviewing the specific evidence of economic obsolescence, the court has concluded that defendant is correct and that the DRC, from which the economic obsolescence is deducted, should be increased to $7,506,460. This will result in the following adjustments to the values of the properties:

| | Depreciated Reproduction Cost (DRC) | Economic Obsolescence | True Cash Value |
|---|---|---|---|
| Buildings | $ 739,630 | $ 222,384 | $ 517,246 |
| Yard Improve. | 126,630 | 38,072 | 88,558 |
| Machinery & Equipment | 6,640,200 | 2,196,851 | 4,443,349 |
| Totals | 7,506,460 | 2,457,307 | 5,049,153 |
| Plus Land | | | 553,240 |
| Total | | | $5,602,393 |

Defendant's second point concerns the definition of fair market value used by the court in its opinion. That definition, quoted on pages three and four of the opinion, was taken from the 8th Edition of *The Appraisal of Real Estate* published by the American Institute of Real Estate Appraisers, a widely accepted and cited appraisal text. Defendant contends that

---

[1] One indication of economic obsolescence would be to deduct the Castle and Cooke sale (indication of value) which the court views as being $5,000,000, from defendant's DRC of $7,506,460, which gives an indicated amount of economic obsolescence of $2,506,460.

the element of the definition which concerns "terms equivalent to cash" is inconsistent with the definition of market value as established in the department's administrative rule, OAR 150-308.205-(A)(1)(a). The relevant portion of that administrative rule states:

> "Market Value as a basis for true cash value shall be taken to mean the highest price *in terms of money* which a property will bring if exposed for sale in the open market, * * *." (Emphasis added.)

 The court does not view the definitions as being inconsistent with each other. The phrases "terms equivalent to cash" and "in terms of money" appear to convey the same meaning. A word of caution, however, is appropriate. In order to prove "cash equivalency," substantial data is required to demonstrate the effects of terms on the market overall.[2] It is not sufficient to simply demonstrate that terms have made a difference in the price as to a single property. Assumptions about the effect of contracts or terms likewise are not proof. *U. S. Nat'l Bank of Oregon v. Dept. of Rev.*, 8 OTR 256 (1980). It is worth noting that to date no party before this court has been able to establish the data necessary to apply the concept.

Plaintiff shall prepare a form of judgment consistent with the opinion and as modified herein.

---

[2] The concept has been applied in a variety of contexts. It appears, however, that in some contexts there are still many questions that must be answered before it can be accepted. *See, for example,* Sirmans, et al., *Cash Equivalency Valuation for Creative Financing Methods,* The Appraisal Journal, July 1984, at 420.