IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

RICHARD B. SOLOMON          )
and ALYCE E. FLITCRAFT,      )
                            )
          Plaintiffs,        )          TC-MD 140121N
                            )
     v.                     )
                            )
MULTNOMAH COUNTY ASSESSOR,    )
                            )
          Defendant.         )          **FINAL DECISION**

This Final Decision incorporates without change the court's Decision entered

December 30, 2014.  The court did not receive a request for an award of costs and disbursements

within 14 days after its Decision was entered.  *See* TCR-MD 16.

Plaintiffs appeal the exception real market value and maximum assessed value of

property identified as Account R241257 (the subject property) for the 2013-14 tax year.  Trial

was held in the courtroom of the Oregon Tax Court, Salem, Oregon, on October 28, 2014.  Jack

L. Orchard, Attorney at Law, appeared on behalf of Plaintiffs.  Plaintiff Richard B. Solomon,

Certified Public Accountant (Solomon), and Mark Hepner, SRA (Hepner), testified on behalf of

Plaintiffs.  Barry Dayton appeared on behalf of Defendant.  Defendant called no witnesses at

trial.  Plaintiffs' Exhibit 1 was received without objection.  Defendant's Exhibits B, C, and D,

and its Rebuttal Exhibits E, F, and J were received without objection.  Defendant's Rebuttal

Exhibits B, C, and D were received over Plaintiffs' objection.

## I.  STATEMENT OF FACTS

In his appraisal report, Hepner described the subject property as a townhouse built in

1996 in Portland's Pearl District with three levels, a private courtyard, and a two-car garage

surmounted by a studio workspace.  (Ptfs' Ex 1 at 7-8, 20.)  Solomon testified that the three

levels of the main house contained 1,750 square feet of living space, and that the studio contained an additional 360 square feet. At trial, the parties stipulated that the 2013-14 real market value of the subject property was $760,000, the real market value that Hepner concluded in his report. (*Id*. at 4.) Defendant's representative stated at trial that Defendant's appraiser had concluded a value of $759,000.

Solomon testified that Plaintiffs added an elevator to the subject property in 2012. (*See also* Def's Rebuttal Ex E). Solomon testified that the elevator is a "pneumatic vacuum elevator," operated by air pressure rather than by cable or piston. He testified that the elevator shaft is a 37-inch diameter cylinder housed in the corner of the courtyard and accessible only from inside the townhouse. (*See also* Def's Rebuttal Exs F, J at 3-4.) Solomon testified that the ground-level door to the courtyard was removed to install the elevator, necessitating use of a sliding glass door in the bedroom for access to the courtyard and garage. He testified that the remodeling made necessary by the elevator reduced kitchen storage space and the size of a bathroom.

Solomon testified that Plaintiffs' total cost to install the elevator was about $255,000, with $43,400 attributable to the cost of the elevator equipment and the remainder attributable to building modifications required by the elevator. (*See also* Def's Ex B.) He testified that the elevator was installed solely for the benefit of his wife, whose knee ailment impeded climbing the stairs to her pottery studio and to the upstairs bedroom. Solomon testified that he did not ride in the elevator because its ride was bumpy and its small size reminded him of a coffin. He testified that they installed the elevator rather than moving because they had lived at the subject property for 14 years, knew all their neighbors, and wanted to stay there.

/ / /

/ / /

A.      *Plaintiffs' Appraisal*

Hepner completed an appraisal report valuing the subject property as of January 1, 2013. (Ptfs' Ex 1 at 3.) Hepner wrote that he relied exclusively on the sales comparison approach and concluded the subject property's real market value was $760,000 as of January 1, 2013. (*Id.* at 4.) He wrote that the cost and income approaches were not applicable for the following reasons:

> "The cost approach is not considered reliable in this case and it will not be presented. The need to estimate accrued depreciation and value contribution from common elements weakens its reliability. Townhome units like the subject are seldom purchased based on their income potential. The income approach is not meaningful in the appraisal of this property * * *."

(*Id.*) In his report, Hepner identified four comparable sales. (*See* Ptfs' Ex 1 at 8-9.) The comparables ranged in size from 1,850 to 2,831 square feet, and in adjusted sale price from $659,700 to $855,100. (*Id.*) Hepner testified under cross-examination that his appraisal report erroneously stated the subject property's gross living area. A sketch in his appraisal recorded "16" instead of "19" in three sets of wall measurements, resulting in a calculated gross living area of the subject property that understated its actual square footage by at least 243 square feet.[1] Hepner testified that the error in his calculation of the subject property's gross living area resulted in the adjusted sale price for the largest comparable sale being too low.

Comparable sale 2, which Hepner described in his report as the "most comparable" sale, was the May 2012 sale of another townhouse of identical age and size to the subject property and within the subject property's development. (Ptfs' Ex 1 at 8.) Solomon testified that sale 2 was one of seven similarly designed townhouses that included the subject property. (*Cf.* Def's Rebuttal Ex J.) Its unadjusted sale price was $750,000. (Ptfs' Ex 1 at 8.) Hepner made an

---

[1] The square footage given in the appraisal is 1,867 square feet, which is 243 square feet less than the square footage to which Solomon testified. Recalculating the area from the building sketch would yield an understatement of 264 square feet.

upward adjustment for rising market prices and a downward adjustment to reflect that it had a "completely finished workspace[,]" arriving at an adjusted sale price of $762,500. (*Id*.)

B.    *Plaintiffs' Evidence of Elevator Value*

Hepner wrote that the "primary function" of his appraisal was "to determine if the installation of an elevator has resulted in an increase of value." (Ptfs' Ex 1 at 10.) In his appraisal report, Hepner described the elevator as follows:

> "[T]he elevator in question is a unique design using a pneumatic operating system powered by compressed air. Elevators of this type are sometimes selected for use in retrofit installations because they do not require construction of a shaft, pit, or machine room. The car is elevated between floors using a vacuum system. I have personally experienced the ride on two occasions and found it to be below expectations. The car moves slowly and the ride is jerky. In addition, this particular elevator is very small with an interior cabin dimension of just 32 [inches] and a door width of 21 [inches]. It is not large enough to comfortably accommodate a wheelchair * * *. This is a one-person elevator which cannot effectively serve a care-giver and a non-ambulatory user in the same trip."

(*Id*. at 1.) Hepner testified that, in order to identify any value contribution from the elevator, he considered two sets of "directly paired sales" and four more pairs analyzed by price per square foot. (Ptfs' Ex 1 at 10-12.) Hepner testified that he also considered interviews with real estate professionals and builders and included notes from those interviews in his report. (*Id*. at 12-13.)

1.    *Directly Paired Sales*

Hepner wrote that his first set of directly paired sales comprised three units within a six-unit complex called Meridian Ridge. (Ptfs' Ex 1 at 11.) The three units were "identical," except that one of them had an elevator installed and the other two were " 'elevator ready' with shaft and wiring installed but no elevator in place." (*Id*.) Each of the two elevator-ready units sold for $557,000, one in March 2010 and one in September 2010. The unit with the elevator sold for $560,000 in February 2011. (*Id*.)

Hepner wrote that his second set of directly paired sales comprised two "nearly identical" townhouses within the same complex "in the Lair Hill neighborhood of Southwest Portland." (Ptfs' Ex 1 at 12.)  Both townhouses had elevators.  (*Id*.)  One of them, which was 2,368 square feet, sold to "an elderly couple who needed an elevator for health reasons" in March 2013 for $500,000, or $211.14 per square foot.  (*Id*.)  The other, which was 2,280 square feet, sold in April 2014 for $454,000, or $199 per square foot, to "a younger couple who did not care for the elevator and were in fact concerned regarding the extra cost that might be associated with its maintenance."  (*Id*.)

2.      *Per-Square-Foot Paired Sales*

Hepner wrote that his first per-square-foot paired sale set comprised two homes in Lake Oswego, one with an elevator and one without.  (Ptfs' Ex 1 at 10.)  The elevator-equipped home sold in August 2009 for $428,750, or $121.63 per square foot, to a buyer "who stated the elevator contributed no value in his eyes" and who sealed shut the elevator doors during remodeling shortly after the purchase.  (*Id*.)  The home without an elevator sold in February 2009 for $465,000, or $122.63 per square foot.  (*Id*.)  Hepner wrote that "[t]he homes were similar enough in most respects that if the elevator * * * contributed any significant value, it should have made some difference in the price paid per square foot."  (*Id*.)

Hepner wrote that his second set comprised two "nearly identical" split-level homes. (Ptfs' Ex 1 at 10.)  The home without an elevator sold for $137.11 per square foot in December 2007; the home with an elevator sold for $110.37 per square foot in November 2008.  (*Id*.)  Hepner wrote that his third set comprised a 3,706-square-foot, four-story home and a 2,742-square-foot home that Hepner described as "very similar."  (*Id*. at 10-11.)  The 3,706-square-foot home had an elevator and sold in December 2012 for $625,000, or $168.65 per square foot; the

2,742-square-foot home did not have an elevator and sold in August 2012 for $460,000, or $167.76 per square foot. (*Id.*) Hepner wrote that his fourth set comprised 1,860 and 2,057-square-foot homes located "a few blocks down the street" from one another in northwest Portland. The former, with an elevator, sold in June 2011 for $535,000, or $287.63 per square foot. The latter, without an elevator, sold in July 2010 for $580,000, or $281.96 per square foot. (*Id.*)

> 3.   *Additional Data*

Hepner wrote that he interviewed multiple real estate agents and an experienced builder, who "expressed different opinions regarding the value contribution of elevators." (Ptfs' Ex 1 at 12.) Hepner reported that all professionals interviewed stated: "[T]here are two factors that make an elevator valuable; 1) If the property owner or buyer is handicapped, [and] 2) [i]f there are design issues that make an elevator a useful tool for moving not only people but groceries, furniture, etc." (*Id.*) Hepner concluded from his interviews that elevators add value to higher-priced (above $500,000) homes on hillside lots with the garage under the living space, if the elevators are "fully functional and adequately sized for wheelchair access." (*Id.* at 12.)

Hepner testified that a person with an ambulatory disability who wished to live in the Pearl District could readily purchase a single-level condominium in a high-rise with a more wheelchair accessible elevator than the one in the subject property.

> 4.   *Reconciliation*

Hepner testified that he concluded that the elevator did not contribute any value to the subject property. (*See* Ptfs' Ex 1 at 13.) He wrote that he based that conclusion "primarily on the fact the elevator is too small to comfortably accommodate a wheelchair and elevators are not typically installed in properties of this design." (*Id.*)

C.    *Defendant's Evidence*

Defendant did not call any witnesses at trial and did not offer its appraisal report into evidence. Defendant submitted a document entitled "Richard B. Solomon & Alyce Flitcraft Elevator Project Costs," accompanied by invoices for architectural and engineering fees, elevator equipment costs, general contractor costs, and other costs incurred for work done at the subject property. (Def's Ex B.) That document indicated a total cost of $255,983.60, with costs of $15,557.43 attributed to "architectural and engineering," $43,400 to "elevator equipment," $190,000 to "general contractor," and $7,026.17 to "other costs paid directly[.]" (*Id.* at 1.)

On rebuttal, Defendant submitted data from the *Americans With Disabilities: 2010* report from the United States Census, distinguishing between persons with difficulty climbing stairs and persons using wheelchairs. (Def's Rebuttal Ex B at 17.) That data showed that nationally 12.6 percent of the population over age 15 and 39.4 percent of the population over age 65 had a disability involving walking or using stairs. (*Id.*) The percentage of the population over age 15 with "severe" difficulty using stairs was 3.2, but only 1.5 percent of the general population of that age used a wheelchair. (*Id.*) Furthermore, 11.7 percent of the population over age 65 had "severe" difficulty using stairs, but only 5.2 percent used a wheelchair. (*Id.*)

Defendant also submitted data for the United States Census's *2013 American Community Survey* indicating that 6.1 percent of the Multnomah County population had an "ambulatory difficulty" in 2013. (Def's Rebuttal Ex C at 2.) That data did not further distinguish the type of difficulty or whether the affected persons used a wheelchair. (*See id.*)

D.    *Procedural Posture and Relief Requested*

The Multnomah County Board of Property Tax Appeals upheld the 2013-14 exception real market value of $32,210 on the tax roll. (Ptfs' Compl at 4.) Plaintiffs request that the court

find the elevator did not increase the subject property's 2013-14 real market value. (*Id*. at 1.) Defendant in its Answer counterclaimed for an exception real market value of "$80,000, as per ORS 308.205(2)(c)." (Def's Ans at 1.) Defendant subsequently increased its counterclaim to $255,000 in exception real market value, but at trial orally withdrew its Amended Counterclaim, seeking instead the $80,000 claimed in its Answer. (*Cf*. Def's Am Countercl at 1.)

## II. ANALYSIS

The issue is the subject property's exception real market value for the 2013-14 tax year. Differently stated, the issue is whether the elevator increased the subject property's 2013-14 real market value by at least $10,000 and was, therefore, "[n]ew property or new improvements to property" under ORS 308.149(5).[2]

A.    *Standard of Proof*

Under ORS 305.427, the party seeking affirmative relief in this court bears the burden of proof, and "a preponderance of the evidence shall suffice to sustain the burden of proof." Preponderance of the evidence is the lowest degree of proof required by courts, and is satisfied by a showing that "the facts asserted are more probably true than false." *Cook v. Michael* (*Cook*), 214 Or 513, 527, 330 P2d 1026 (1958); *see also Riley Hill General Contractor v. Tandy Corp.*, 303 Or 390, 402, 737 P2d 595 (1987) (*Cook* analysis of standards of proof "has been endorsed repeatedly" by the Oregon Supreme Court). In addition, this court has jurisdiction to determine the real market value of property "on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

/ / /

/ / /

---

[2] The court's references to the Oregon Revised Statutes (ORS) are to 2011.

In this case, Plaintiffs bear the burden of proving that the elevator installation did not increase the subject property's 2013-14 real market value. Defendant bears the burden of proving its counterclaim that the exception real market value of the elevator was $80,000.

B.      *Exception Real Market Value of the Elevator*

      1.      *Exception Value and Exception Real Market Value*

Although annual increases to maximum assessed value are generally capped at three percent, ORS 308.146(3) enumerates certain properties for which maximum assessed value is computed by a different formula. Department of Revenue rules refer to those properties as "qualified exceptions" and the value they add to the maximum assessed value is "exception value." *See* OAR 150-308.146(2).

One qualified exception consists of "new property or new improvements to property." ORS 308.146(3)(a). The real market value of "new property or new improvements" is defined as the excess of the real market value of new improvements over the real market value of any retirements. ORS 308.153(2)(a). The real market value of new improvements is their incremental contribution to the real market value of the property as a whole; *i.e.*, it is "the increase in [real market value] of the remodeled property as opposed to the value of the improvements themselves." *Hoxie v. Dept. of Rev.* (*Hoxie*), 15 OTR 322, 326 (2001). The property's exception value is computed by multiplying the real market value of the new property or improvements by a statutory ratio known as the "changed property ratio." *See* ORS 308.153(1); *e.g.*, *Hoxie*, 15 OTR at 330. Because the exception value is calculated from the real market value of the new property or new improvements, that real market value is often referred to as "exception real market value."

/ / /

Exception real market value does not include value resulting from "minor construction," defined as "additions of real property improvements, the real market value of which does not exceed $10,000 in any assessment year or $25,000 for cumulative additions made over five assessment years." ORS 308.149(6). Exception real market value does not include value increases due to factors beyond the addition of the improvements, such as inflation, changes in market demand, or changes in construction codes. *See Hoxie*, 15 OTR at 326.

Here, Plaintiffs may obtain the relief sought in their Complaint if the elevator increased the subject property's real market value by no more than $10,000. If the elevator added $10,000 or less, and if $25,000 of cumulative additions were not made to the subject property over five years, then the elevator installation would qualify as "minor construction" and would not generate exception real market value. *See* ORS 308.149(6).

This court has measured exception real market value as the increase in real market value from one tax year to the next, after removing the part of the increase due to "changes in interest rates, demand, and other market factors * * *." *Magno v. Dept. of Rev.*, 19 OTR 51, 66-67 (2006). Here, the court did not receive sufficient evidence to use that method of calculating the 2013-14 exception real market value. The subject property's 2012-13 tax roll real market value was $598,880, which is less than its 2013-14 real market value. (Ptfs' Compl at 5.) However, it is unclear if the 2012-13 tax roll real market value is accepted by the parties or supported by real market value evidence. Furthermore, it is unclear what, if any, increase in the subject property's real market value between January 1, 2012, and January 1, 2013, was due to market factors.

/ / /

/ / /

/ / /

2.      *Real Market Value Contributed by the Elevator*

Real market value is defined by ORS 308.205(1) as:

> "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

The assessment date for the 2013-14 tax year was January 1, 2013. *See* ORS 308.007(1)(a); ORS 308.210. Three approaches are used to determine the value of real property: the sales comparison approach, the income approach, and the cost approach. *Allen v. Dept. of Rev.*, 17 OTR 248, 252 (2003); *see also* OAR 150-308.205-(A)(2)(a) (requiring county assessors to consider, but not necessarily apply, each of the three approaches). "[W]hether in any given assessment one approach should be used exclusive of the others or is preferable to another or to a combination of approaches is a question of fact to be determined by the court upon the record." *Pacific Power & Light Co. v. Dept. of Revenue*, 286 Or 529, 533, 596 P2d 912 (1979).

a.      Cost Approach

"If the property has no immediate market value, its real market value is the amount of money that would justly compensate the owner for loss of the property." ORS 308.205(2)(c). A property has "no immediate market value" if enough comparable sales cannot be found to estimate value using the sales comparison approach. *Truitt Brothers, Inc. v. Dept. of Rev.*, 10 OTR 111, 114 (1985). Thus, "the statute [ORS 308.205(2)(c)] is simply saying that if there is no immediate market, then the value of the property is to be estimated using a method other than the sales comparison approach." *Id*. In such a case, the valuation method to be used would generally be the cost approach. *Id*. at 118.

Defendant argued at closing that the subject property's elevator had no market and that its real market value should be just compensation under ORS 308.205(2)(c)--in other words, that it

could not be valued using the sales comparison approach and that the cost approach should instead be used. However, as stated above, exception real market value is the increase in the whole property's real market value, rather than the value of the improvements in isolation. ORS 308.149(5)(a); *Hoxie*, 15 OTR at 326. The relevant question, then, is not whether there is a market for the elevator alone, but whether there is a market for the subject property.

The evidence supports a finding that there was a market for townhouses on January 1, 2013. A virtually identical townhouse in the subject property's development sold seven months before the assessment date, and another townhouse a few blocks away sold three months prior. Furthermore, the evidence supports a finding that the market for townhouses with elevators was not distinct from the general market for townhouses. Hepner's testimony and appraisal report indicated that buyers in the market for townhouses were willing to purchase townhouses with elevators, although they might not be willing to pay more for them. Hepner's opinion is supported by his second set of directly paired sales and his notes of interviews with real estate professionals. Defendant offered no evidence to rebut Hepner's opinion.

Therefore, the court finds that a market existed for the subject property on the assessment date and that ORS 308.205(2)(c) is inapplicable.

        b.      Sales Comparison Approach

Hepner, using the sales comparison approach, concluded the subject property's real market value was $760,000 as of January 1, 2013. Defendant's representative agreed, stating at trial that its appraiser concluded a real market value of $759,000.

Hepner also concluded that none of the subject property's real market value was attributable to the elevator. He reasoned that the elevator was too small for both a wheelchair

///

and a caregiver. He also reasoned that an elevator is superadequate in a townhouse with garage-level living space such as the subject property.

(1) Wheelchair Issue

Hepner's evidence of the functional utility of the subject property's elevator for wheelchair users was not well supported. Hepner opined that it could not "comfortably" fit a wheelchair, but admitted lack of expertise in accessible building design and did not provide wheelchair measurements to support his opinion. Also, Hepner did not account for use of the elevator by persons with difficulty climbing stairs who did not use wheelchairs. As Defendant's rebuttal exhibits demonstrated, the market segment with medical reasons to seek an elevator extends far beyond wheelchair users.

The court finds that, given the constraints of building an elevator in the subject property, the elevator performs the function for which it was designed. The elevator's size did not diminish its value contribution to the subject property.

(2) Superadequacy Issue

Hepner presented two categories of evidence that the elevator was superadequate: evidence that elevators added little or no market value in similar properties and evidence that buyers who paid more for elevators had special motivations.

With regard to the former, Hepner's first set of directly paired sales showed only a miniscule difference in sale prices between three otherwise identical units, one of which had a fully installed elevator while the other two had only elevator shafts and wiring. Hepner's per-square-foot sales also supported his conclusion that elevators add little value to many types of properties. His interviews revealed the opinion among real estate professionals that elevators add value where the living space is above the garage, but not otherwise.

On cross-examination, Defendant challenged the comparability of Hepner's paired sales on the basis that they were not adjusted for time and other differences. OAR 150-308.205-(A)(2)(c) states, in part, that "[i]n utilizing the sales comparison approach only actual market transactions of property comparable to the subject, *or adjusted to be comparable*, will be used." (Emphasis added.) In other words, when comparing properties, an appraiser should make adjustment for differences or explain why no adjustments are necessary. With respect to his directly paired sales, Hepner wrote that his first set of properties were "identical" except for the elevator and that his second set of properties were "nearly identical" except for the elevator. Thus, Hepner explained why no adjustments were necessary. The court found Hepner's per-square-foot paired sale sets less persuasive because of differences between the properties for which Hepner made no adjustments. Hepner's third set included one property that was nearly 1,000 square feet larger than the other property. Hepner's second and fourth sets included properties that sold nearly one year apart.[3]

Hepner's second set of directly paired sales tended to show that special buyer motivation rather than general market demand accounted for higher prices resulting from elevators: an elderly couple requiring an elevator paid more for a property having one than did a younger couple for a similar property.

Overall, Hepner's directly paired sales and per-square-foot paired sales tended to show that the market for townhouses included people who did not place value on elevators. Other than challenging Hepner's failure to make adjustments in his two paired sales analyses, Defendant presented no competent evidence to rebut Hepner's evidence and conclusion.

---

[3] *But see Sabin v. Dept. of Rev.*, 270 Or 422, 427-29, 528 P2d 69 (1974) (court must consider unadjusted sale of subject property nearly two years after valuation date unless opposing party shows market conditions changed during interval). Here, Defendant presented no evidence of changed market conditions.

(3)     Defendant's Statement of Its Appraisal's Concluded Value

Additional support for Hepner's conclusion comes from Defendant's stipulation at trial that the subject property's real market value was $760,000 as of January 1, 2013. Defendant's representative stated that its appraiser had concluded the subject property's real market value as was $759,000. The real market value reportedly found by Defendant's appraiser was nearly identical to Hepner's adjusted comparable sale 2--a townhouse in the subject property's development that was virtually the same as the subject property, but lacking an elevator.

On the face of it, a conclusion by Defendant's appraiser that the subject property was equal in real market value to an identical property without an elevator supports Plaintiffs' position that the subject property's elevator added no real market value. No better comparable could be expected than a townhouse of identical size, age, and location.[4] Defendant's concession that its own appraiser reached the same real market value conclusion for the subject property that Plaintiffs' appraiser reached for comparable sale 2 tends to show that the subject property's elevator did not contribute to its real market value.

To rebut the inference described above, one would expect Defendant to call its own appraiser to testify. If Defendant's appraiser's opinion of the adjusted value of comparable sale 2 differed from Hepner's opinion, then testimony to that effect would have supported Defendant's position. However, Defendant did not call its appraiser to testify.

The court finds that Plaintiffs proved by a preponderance of the evidence that the subject property's elevator did not contribute to its 2013-14 real market value. Defendant presented no competent evidence supporting a different conclusion. As a result, the court concludes that the addition of the elevator did not result in exception real market value for the 2013-14 tax year.

---

[4] Hepner's error regarding the subject property's size did not affect his adjustments to comparable sale 2.

III. CONCLUSION

After considering the testimony and evidence presented, the court concludes that the addition of the elevator to the subject property did not result in exception real market value for the 2013-14 tax year. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiffs' appeal is granted.

IT IS FURTHER DECIDED that Defendant's counterclaim is denied.

Dated this ___ day of January 2015.

ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this final decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within <u>60</u> days after the date of the final decision or this final decision cannot be changed. TCR-MD 19 B.*

*This document was signed by Magistrate Allison R. Boomer on January 20, 2015. The court filed and entered this document on January 20, 2015.*